1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   MT, a minor by and through his Guardian    )   Case No.:  3:22-cv-00171-BEN-KSC
     Ad Litem VIKTORIIA ZUBKOVA; AT a          )
12   minor by and through his Guardian Ad       )   **ORDER GRANTING-IN-PART**
     Litem VIKTORIIA ZUBKOVA; and              )   **DEFENDANTS' MOTION TO**
13   LEYLA BOROVIK,                            )   **DISMISS PLAINTIFFS' FIRST**
                                                )   **AMENDED COMPLAINT**
14                    Plaintiffs,               )
                                                )
15   v.                                         )
                                                )
16   UNITED STATES OF AMERICA;                 )   **[ECF No. 10]**
     TRENT E. PETERSEN; and DOES 1             )
17   through 30, inclusive,                     )
                                                )
18                    Defendants.               )
19   _____        )

20

21   I.    __INTRODUCTION__

22          Plaintiffs Leyla Borovik, and both MT and AT, minors by and through their

23   Guardian Ad Litem Viktoriia Zubkova, bring this action against Defendants the United

24   States of America (the "United States") and Trent E. Peterson ("Agent Peterson").  ECF

25   No. 4.  Before the Court is Defendants' Motion to Dismiss Plaintiffs' First Amended

26   Complaint.  ECF No. 10.  The Motion was submitted on the papers without oral argument

27   pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil

28   Procedure.  *See* ECF No. 13.  After considering the papers submitted, supporting

                                        -1-

documentation, and applicable law, the Court **GRANTS-IN-PART** the Motion to Dismiss.

## II.   BACKGROUND

This case arises from alleged events that occurred during a raid by the Federal Bureau of Investigation ("FBI") of Plaintiffs' home.

### A.   Statement of Facts[1]

On October 25, 2019, at 6:00 a.m., FBI agents, including supervising "FBI Agent, Trent E. Peterson, conducted a paramilitary SWAT raid at Plaintiffs' home with attack canines, assault weapons, bull horns, and high intensity lights . . . to execute an arrest and search warrant for alleged financial crimes" committed by Plaintiffs' father.  ECF No. 4 ("FAC") at 2, ¶ 2; 6, ¶ 20.  "Tuchinsky and his business partners had been charged with bribing a Federal Express supervisor to obtain routes for their package delivery trucking companies in Utah."  *Id.* at 7–8, ¶ 28.

In executing the warrants, Defendants forcefully banged on the door "in a manner that would lead a reasonable person to believe the door was going to be involuntarily breached," and "screamed, 'FBI, open the door.'"  *Id.* at 6, ¶ 20.  Plaintiffs' father, Yevgeny Tuchinsky, peacefully opened the door and "was held at gunpoint with bright lights flashing in his face while numerous agents stormed the interior of the home in full paramilitary SWAT gear and assault weapons."  *Id.*  The "[a]ttack canines were held outside the door," and Tuchinsky was placed in handcuffs, shackled with leg irons, and informed he was under arrest.  *Id.*  Tuchinsky told the "agents that the only other occupants of the residence were his wife and two children, and pleaded with the [] agents 'please do not touch my children and wife.'"  *Id.* at 6, ¶ 21.

MT, AT, and their mother, Leyla Borovik, were awoken "by a bullhorn ordering them to come out with their hands above their heads."  *Id.* at 2, ¶ 2.  Plaintiff MT is a six-

---

[1]   The majority of the facts set forth are taken from the FAC and for purposes of ruling on the United States' Motion to Dismiss, the Court assumes the truth of the allegations pled and liberally construes all allegations in favor of the non-moving party.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 U.S. 1025, 1031 (9th Cir. 2008).

year-old child, while AT is eight. *Id.* "MT emerged from his bedroom in his pajamas with his hands raised and was paralyzed by fear as he was forced to watch his father being arrested, handcuffed and shackled while a FBI agent pointed at [sic] weapon at him with his finger on the trigger." *Id.* at 6, ¶ 22. An "agent tagged MT with the laser of his assault rifle on his chest, then on his forehead," and Tuchinsky "pleaded with the agents not [to] harm his child." *Id.* Borovik emerged from her bedroom to lights being flashed in her face, and "was commanded to walk through the hallway where she saw FBI agents in paramilitary uniforms and bulletproof vests brandishing what appeared to be machine guns pointed towards her six-year old son MT, who was still in his pajamas" and "sobbing uncontrollably." *Id.* at 7, ¶ 23. MT was "watching his father being held against the wall with an assault weapon pointed at his head." *Id.* "Borovik kept pleading to find out what was happening, but the FBI agents refused to respond and Tuchinsky was unable to respond." *Id.* at 7, ¶ 24.

"The FBI agents resumed issuing the loud commands through the bullhorns, waking eight-year-old AT who emerged from her bedroom, still wearing her top and undergarments . . . ." *Id.* at 7, ¶ 25. As AT walked through the hall, Defendants continued to shout commands and brandish their weapons, which caused Borovik, AT, and MT "to be terrified the agents would shoot them." *Id.* Defendants took MT and AT from Borovik and "without the consent of either parent, [D]efendants took MT and AT into separate bedrooms and conducted an interrogation behind closed doors." *Id.* at 7, ¶ 26. AT was detained by a male agent, without the consent or presence of her mother, wearing only a top and undergarments. *Id.* at 2, ¶ 2. Borovik was also taken to a separate room for interrogation, after which, she was allowed to get dressed. *Id.* at 7, ¶ 26. Agents then continued to interrogate Borovik after she was dressed, "and MT and AT continued to be detained in two separate rooms by agents behind closed doors." *Id.* at 7, ¶ 27.

Plaintiffs allege "[t]here were no exigent circumstances that justified the display of force and weapons or the removal of MT and AT from their parents." *Id.* at 7, ¶ 28. Tuchinsky was being charged with financial crimes, which "did not include weapons or

drug related matters," and "there were no allegations or suggestion that the safety or welfare of MT and AT were in jeopardy from anything other than the actions of the FBI agents." *Id.* at 7–8, ¶ 28.

Plaintiffs allege that "[t]he tactics were designed to, and did, threaten, intimidate, humiliate, and coerce Plaintiffs Leyla Borovik and her two minor children." *Id.* at 3, ¶ 3. "As a result of the egregious and extreme conduct of [D]efendants, while acting in the course and scope of their employment with Defendant U[nited States] as investigation and law enforcement officers, MT, AT, and Leyla Borovik suffered extreme emotional distress which has manifested itself in emotional and physical symptoms for which they have suffered general and special damages." *Id.* at 8, ¶ 29. Plaintiffs allege that "damages were exacerbated by the fact that Defendant [] instituted forfeiture proceedings which seized the funds and assets of [] [Borovik] and her husband that would have enabled the parents to obtain and/or continue the counseling and therapy needed by MT and AT for the physical and emotional distress they suffered as a result of the raid." *Id.* at 3, ¶ 4.

### B. <u>Procedural History</u>

On February 7, 2022, Plaintiffs filed their original Complaint and on February 16, 2022, Plaintiffs filed their First Amended Complaint. ECF No. 4 ("FAC"). On May 25, 2022, Defendants filed the instant Motion to Dismiss. ECF No. 10 ("Motion"). Plaintiffs filed an Opposition and Defendants replied. ECF No. 11 ("Oppo."); ECF No. 12 ("Reply").

## III. <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed when a plaintiff's allegations fail to set forth a set of facts which, if true, would entitle the complainant to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that a claim must be facially plausible to survive a motion to dismiss. The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). On a motion to dismiss, a court accepts as true a

1    plaintiff's well-pleaded factual allegations and construes all factual inferences in the light
2    most favorable to the plaintiff.  *See Manzarek*, 519 F.3d at 1031.  A court is not required
3    to accept as true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.

4        "Generally, unless the court converts the Rule 12(b)(6) motion into a summary
5    judgment motion, it cannot consider material outside the complaint (*e.g.*, facts presented
6    in briefs, affidavits or discovery materials)."  Phillips & Stevenson, California Practice
7    Guide: Federal Civil Procedure Before Trial § 9:211 (The Rutter Group April 2020).  Thus,
8    in evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents of the
9    complaint and material properly submitted with it.  *Van Buskirk v. Cable News Network,*
10   *Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co.,*
11   *Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).  Courts may also consider any statements
12   made in a pleading or motion, including concessions made in plaintiff's response to the
13   motion to dismiss as well as in response to any other pleading or motion.  Fed. R. Civ. P.
14   10(c).

15   **IV.   DISCUSSION**

16       Plaintiffs allege numerous tort violations through the Federal Tort Claims Act (the
17   "FTCA"), along with a *Bivens* claim for damages.  Plaintiffs' claims or elements thereof
18   depend on whether Defendants used excessive force when executing the search of
19   Plaintiffs' home.  As such, the Court analyzes the reasonableness of Defendants' alleged
20   use of force before addressing the various tort claims and assertions of immunity.  As set
21   forth below, the Court finds that Plaintiffs' FAC states facts sufficient to support their
22   FTCA tort claims alleged against the United States but fails to state a *Bivens* claim against
23   any of the Defendants.  Because the individual Defendants are immune from suit pursuant
24   to the FTCA, the Court does not reach the issue of qualified immunity.

25       **A.   Excessive Force**

26       Claims made pursuant to § 1983 for excessive use of force during an arrest are
27   analyzed under the Fourth Amendment's objective reasonableness standard.  *Graham v.*
28   *Connor*, 490 U.S. 386, 395 (1989).  To determine whether the force used is "objectively

-5-

reasonable," the Court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. Although the right to use some degree of physical coercion to make an arrest is well established, "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). As such, "proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). "The most important factor under *Graham* is whether the suspect posed an immediate threat to the safety of the officers or others." *Est. of Stanley v. City of San Jose*, No. 22-cv-03000-VKD, 2022 WL 16837050, at *4 (N.D. Cal. Nov. 9, 2022) (quoting *Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017)).

Defendants argue that "the FBI agents involved in Tuchinsky's arrest did not use any force against Tuchinsky's family, let alone unreasonable force." Motion at 8. Defendants contend that the agents did not even touch Plaintiffs. *Id.* at 12–13. Defendants argue "that law enforcement officers are entitled to do exactly what the FBI agents did here – take reasonable precautions to ensure their safety and the safety of others during the execution of valid warrants." *Id.* at 15 (citing *Graham*, 490 U.S. at 396). Plaintiffs argue that here, there was no justification for the amount of force used by the agents. Oppo. at 3. Plaintiffs explain that the crimes were financial in nature and "did not include weapons or drug related matters which could pose dangers to Defendants." *Id.*

In *Thompson v. Rahr*, the Ninth Circuit held that "pointing guns at persons who are compliant and present no danger is a constitutional violation." 885 F.3d 582, 586 (9th Cir. 2018) (quoting *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009)). However, *Thompson* involved a traffic stop, which is distinguishable from the case at hand, where agents entered a home pursuant to an arrest and search warrant. *See Thompson*, 885 F.3d

-6-

at 584–85.  In *Michigan v. Summers*, the Supreme Court reviewed whether the search of a home and simultaneous detainment of the occupant was constitutional.  452 U.S. 692, 693 (1981).  There, the search was for narcotics and conducted pursuant to a warrant.  *Id.* at 693–94.  The occupant was forced to remain on the premises during the search, before the officers had probable cause to arrest him.  *Id.* at 696–97.  The Supreme Court found no constitutional violation, holding that "for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  *Id.* at 705.  *Summers* established that officers do have a right to detain persons occupying a home that is the subject of a search warrant.  In *Summers*, only the detention was at issue and the search was for drugs, making it distinguishable from the case at hand, but the holding indicates that reasonable force may be used to detain the occupants of a home being searched.

In *Motley v. Parks*, the Ninth Circuit examined whether a law enforcement officer was justified in pointing a gun at an infant during the search of a home, stating:

> While it may have been reasonable for Kading to have drawn his firearm during the initial sweep of a known gang member's house, his keeping the weapon trained on the infant, as he was alleged to have done, falls outside the Fourth Amendment's objective reasonableness standard. Motley has stated a constitutional violation.

*Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012).  The time period in *Motley* was around 20 minutes.  *Id.* at 1076.  *Motely*'s holding therefore hinted at the time period during which an officer may point a gun at a young occupant of a residence being searched.

In *Avina v. United States*, the Ninth Circuit found issues of material fact as to whether agents used excessive force against two minor children during the search of a home.  681 F.3d 1127, 1132–33 (9th Cir. 2012).  There, the agents obtained a search warrant for a mobile home, believing the vehicle belonged to a suspected drug trafficker.

*Id.* at 1128–29.  Later, the agents discovered they wrote down the wrong license plate number.  *Id.* at 1129.  In analyzing the plaintiffs' FTCA claims for assault and battery, the Court found that the force used against the adult male resident (*i.e.*, forcefully pushing him to the ground) was reasonable, because: (1) it was done during the initial minutes of the search; (2) the man was not following the agents' instructions; and  (3) the agents had no way of knowing that the man was not the suspected drug trafficker or an associate.  *Id.* at 1132.  As to the minor children, however, the Court stated:

> [A] jury could find that the agents pointed their guns at the head of an eleven-year-old girl, "like they were going to shoot [her]," while she lay on the floor in handcuffs, and that it was excessive for them to do so. Similarly, a jury could find that the agents' decision to force the two girls to lie face down on the floor with their hands cuffed behind their backs was unreasonable.

*Id.* at 1132–33.

Finally, in *Tekle v. United States*, the Ninth Circuit held that a reasonable jury could find excessive force, where federal agents held an eleven-year-old boy at gun point, while executing a search and arrest warrant for the boy's parents.  511 F.3d 839 (9th Cir. 2007). The parents "were suspected of narcotics trafficking and tax-related offenses."  *Id.* at 842. The agents were aware that the boy was in the home and when he stepped outside to take out the trash, agents commanded him to turn around with his hands up.  *Id.*  At first, the boy ran back to the house, not knowing the agents were talking to him.  *Id.* at 843.  When the agents repeated themselves, the boy put his hands up and walked towards them.  *Id.* The boy was ordered to lay facedown on the driveway, while an agent held a gun to his head and cuffed him.  *Id.*  The boy was pulled up by the cuffs and agents sat him on the sidewalk for about 15 minutes.  *Id.*  After the father was apprehended, the boy's cuffs were removed and he was placed on a stool in the driveway, where fifteen to twenty agents continued to point their guns at him.  *Id.*  Agents refused the boy's request for his shoes and spat on them.  *Id.*  The officers also made disparaging comments about the home country of the boy's parents.  *Id.*  The Ninth Circuit held that in this case, a jury could find

-8-

the officers used excessive force.  *Id.* at 847.  The Court reversed a grant of summary judgment in defendant's favor and allowed the boy's FTCA claims for assault, battery, false arrest, and IIED to go forward, stating there were issues of fact and that reasonable minds could differ.  *See id.* at 854–56.  The Court focused on the fact that he was an eleven-year-old child who presented no threat and was vastly outnumbered by law enforcement personnel.  *See id.* at 846, 849, 850, 855–56.

The facts of *Avina* and *Tekle* are most akin to the facts of the instant case, because the plaintiffs were occupants of homes being searched (under warrant) and subsequently brought claims under the FTCA alleging excessive force.  Here, Plaintiffs allege similar facts in that firearms continued to be pointed at them after it was clear they presented no threat to the agents, and they were detained in an unreasonable manner.  Reading the FAC in the light most favorable to Plaintiffs, the Court finds that questions of fact remain as to whether Defendants use of force was reasonable under the circumstances.

First, the crimes on which the arrest and search warrants were based were for alleged financial crimes, which "did not include weapons or drug related matters," indicating that the suspected crimes were not crimes of violence.  *See* FAC at 7–8, ¶ 28.  In *Summers*, *Avina*, and *Tekle*, the agents/officers conducting the searches were doing so based on suspected drug violations.  In *Motley*, there were potential gang associations.  *See Motely*, 432 F.3d at 1076.  The allegedly non-violent nature of the crimes at issue here, distinguishes these cases and favors Plaintiffs' argument that the "paramilitary raid" was excessive under the circumstances.

Second, nothing in the FAC implies that Borovik, MT, AT, or even Tuchinsky posed a threat to the FBI agents on the scene.  After Tuchinsky "peacefully" opened the door, he was held at gunpoint while handcuffed and shackled.  *Id.* at 6, ¶ 20.  While Tuchinsky was being arrested, a firearm laser was allegedly aimed at the forehead of MT, while the agent pointing the weapon allegedly held his finger on the trigger.  *Id.* at 6, ¶ 22.  The six-year-old child, MT, was "paralyzed by fear" and "sobbing uncontrollably"—allegations that make it unreasonable to assume MT was a threat to the agents.  *See id.* at 6, ¶ 22; 7, ¶ 23.

After having lights flashed in her face, Borovik allegedly saw the firearms pointed at her son and pleaded with the agents to figure out what was happening. *Id.* at 7, ¶¶ 23–24. Eight-year-old AT then emerged from her room in a top and undergarments and as she walked down the hall, Defendants brandished their firearms. *Id.* at 7, ¶ 25. An eight-year-old girl walking down the hallway as instructed by the agents can hardly be read as a threat. The FAC then alleges that agents continued to aim their weapons at Plaintiffs, causing Borovik, AT, and MT "to be terrified the agents would shoot them." *Id.* Though Plaintiffs allegedly presented no threat, they were held at gunpoint, while agents took MT and AT from Borovik's arms and into separate bedrooms. At no point did Plaintiffs attempt to flee.

Construing these allegations liberally, Plaintiffs allege that they posed no threat to the FBI agents on site. Whether there were exigent circumstances making the alleged conduct reasonable can be fleshed out during discovery. At this stage in the proceedings, however, the Court cannot say the use of force was reasonable. *See Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994) ("[W]hether a particular use of force was reasonable is rarely determinable as a matter of law."). As such, the Court proceeds to address Plaintiffs' claims under the FTCA[2] and *Bivens*.

## B.  Federal Tort Claims Act

"When federal employees are sued for damages for harms caused in the course of their employment, the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671–2680, generally authorizes substitution of the United States as the defendant." *Hui v. Castaneda*, 559 U.S. 799, 801 (2010). Defendants argue that Agent Peterson and the other individual Defendant agents are immune from Plaintiffs' FTCA claims, because "the FTCA explicitly

---

[2]  The Court notes there is an exception to the United States' waiver of sovereign immunity in the FCTA for violations of the Constitution. *See* 28 U.S.C. § 2679(b)(2(A). Plaintiffs' only constitutional claim for relief is made under *Bivens*. Although Plaintiffs' *Bivens* claim cannot proceed, *see infra* Part IV.C., and as a result, the Fourth Amendment excessive force claim consequently fails, the alleged use of unreasonable force can still inform Plaintiffs' intentional tort claims made pursuant to the FTCA. As such, the Court considers its *Graham* analysis when analyzing the tortious conduct alleged by Plaintiffs.

precludes the liability of any federal employee sued in his individual capacity for a tort committed while acting within the scope of his employment." Motion at 11–12 (citing 28 U.S.C. § 2679(b)(1)). Plaintiffs respond that to be immune from liability, the Attorney General must issue a scope certification confirming that the employee was acting within the scope of his employment. Oppo. at 12–13. Plaintiffs state that "[u]pon submission of a scope certification, Plaintiffs will assert their claims under the [] [FTCA] solely against the United States." *Id.* at 13. Defendants replied that a scope certification seemed unnecessary, given the FAC's concession that Peterson and the other agents were acting within the scope of their employment. Reply at 2. Even so, Defendants submitted the applicable scope certification with their Reply, asserting that Peterson was acting within the scope of his employment with the FBI. *See* ECF No. 12-1 at 1–2.

Plaintiffs concede that the Agent Peterson and the Doe Defendants were acting within the scope of their employment, *see* FAC at 4–5, ¶¶ 13–14, and Defendants' Reply submits a scope certification as to Agent Peterson specifically. As such, the Court concludes that Plaintiffs' FTCA claims apply only to the United States.[3] Accordingly, the FTCA claims lodged against Agent Peterson and the Doe Defendants are **DISMISSED**. However, as explained below, Plaintiffs plausibly state their FTCA claims against the United States.

### i.   *Assault and Battery*

Defendants first argue that Plaintiffs allege assault and battery as a single claim for relief when, in California, they are distinct. Motion at 11. Defendants further argue that Plaintiffs have not alleged facts sufficient to support a claim for either assault or battery

---

[3]   The Court notes that 28 U.S.C. § 2680(h) provides an exception to the United States' waiver of sovereign immunity, barring claims for intentional torts, including assault, battery, and false imprisonment. There is an exception to the exception, however, for torts committed by officers of the United States who are "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal Law." *See id.* Accordingly, although the parties did not cite § 2680(h), they reached the correct conclusion that sovereign immunity has not been waived in this instance.

because none of the allegations "involve any touching of Plaintiffs, let alone touching with unreasonable force." *Id.* at 12. Plaintiffs respond that there is little doubt Plaintiffs have stated a claim for assault, based on allegations that Defendants intentionally aimed their weapons at Plaintiffs. Oppo. at 13–14. As to battery, Plaintiffs argue that: (1) actual touching is not always required; and (2) reading the FAC in the light most favorable to Plaintiffs, the Court can infer that physical touching occurred based on the allegation that MT and AT were removed from their mother's arms. *Id.* at 14–16.

a.  Assault

The FTCA incorporates the substantive law of the state where the allegedly tortious act occurred. To plead assault in California, a plaintiff must state that: "(1) defendant acted with intent to cause harmful or offensive contact, or threatened to touch plaintiff in a harmful or offensive manner; (2) plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the threat; (3) plaintiff did not consent to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a substantial factor in causing plaintiff's harm. *So v. Shin*, 212 Cal. App. 4th 652, 668–69 (2013), *as modified on denial of reh'g* (Jan. 28, 2013) (citations omitted).

Defendants argue that Plaintiffs were not touched by the agents and that the actions were justified by the valid warrant. However, assault does not require physical touching and as stated *supra*, questions of fact remain as to whether the agent's conduct was reasonable or justified, even with the warrant. Although Plaintiffs were subdued and presented no reasonable threat to the agents (according to the FAC), firearms were aimed at Plaintiffs. The threat of being shot amounts to a threat of harmful or offensive contact. The FAC further states how all Plaintiffs were terrified of being shot, and that the agents' "tactics were designed to, and did, threaten, intimidate, humiliate, and coerce Plaintiffs . . . ." FAC at 3, ¶ 3. As such, Plaintiffs sufficiently pleaded psychic injuries from the threat of being shot. Because Defendants make no further arguments, the Court finds that the FAC sufficiently states a claim for assault against Defendant United States. Accordingly,

-12-

1    the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' FTCA assault claim against

2    the United States.

3                                b.    Battery

4            To state a claim for battery in California, a plaintiff must allege that: "(1) defendant

5    touched plaintiff, or caused plaintiff to be touched, with the intent to harm or offend

6    plaintiff; (2) plaintiff did not consent to the touching; (3) plaintiff was harmed or offended

7    by defendant's conduct; and (4) a reasonable person in plaintiff's position would have been

8    offended by the touching." *Shin*, 212 Cal. App. 4th at 669.

9            Defendants argue that Plaintiffs' claim for battery fails because there are no

10   allegations that any of the agents actually touched Plaintiffs.  Defendants discount the

11   Court's obligation to read the allegations in the light most favorable to Plaintiffs.  Although

12   the brandishing of firearms does not constitute actual touching, there are other allegations.

13   The allegations also read that "Defendants, took MT and AT from [Borovik's] embrace"

14   without either parent's consent.  FAC at 7, ¶ 26.  Reading this allegation in the light most

15   favorable to Plaintiffs, the Court can reasonably infer that touching occurred when agents

16   took MT and AT out of their mother's arms.  As to MT and AT, the touching is clear

17   because they were "taken" from their mother by men who were yelling commands and

18   pointing firearms at them, and a reasonable person would be offended by this kind of

19   touching.  There is also a reasonable inference that Borovik's arms were touched or caused

20   to be touched when agents took the children from her embrace.  The implied touching of

21   Borovik is likewise offensive, considering she had her children taken from her amidst the

22   alleged chaos occurring in her home.  In addition, contrary to Defendants' contention,

23   Plaintiffs sufficiently stated the agents' intent to "threaten, intimidate, humiliate, and

24   coerce" Plaintiffs.  *Id.* at 2–3, ¶ 3.  The allegations thus state that Defendants intended to

25   harm Plaintiffs.

26           The Court only addresses the arguments set forth in the briefing and will not provide

27   arguments for Defendants as to the remaining elements of Plaintiffs' battery claim.

28   Accordingly, Defendants' Motion to Dismiss Plaintiffs' battery claim against the United

States is **DENIED**.

    ii.  ***False Imprisonment***

   In California, a false imprisonment claim requires three elements: "(1) the non-consensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Lyons v. Fire Ins. Exchange*, 74 Cal. Rptr. 3d 649, 655 (Cal. Ct. App. 2008). Defendants argue that because the FBI agents were acting pursuant to a valid warrant, "they were acting with lawful privilege and are immune from liability as a matter of law." Motion at 14. Plaintiffs respond that although officers may detain occupants of a premise while searching pursuant to a valid warrant, the agents were required to conduct the detention in a reasonable manner. Oppo. at 16. Plaintiffs argue that here, the conduct was outrageous, and that Plaintiffs were not implicated in the alleged bribery conspiracy giving rise to the warrant. *Id.*

   Defendants rely on the validity of the warrant in arguing that their detention of Plaintiffs was valid. A legal warrant does not immunize agents from an otherwise unreasonable search. *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 971 (9th Cir. 2005) (quoting *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997)) ("When officers obtain a warrant to search an individual's home, they also receive certain limited rights to occupy and control the property; however, the Fourth Amendment binds the officers such that the right to search a home concomitantly obliges the officers to do so in a reasonable manner."). As discussed *supra*, the allegations describe the Plaintiffs being confined without their consent for an unreasonable period of time. Although federal agents may detain persons occupying a home at the outset of a search, continued confinement may become unreasonable at some point. Especially where two of the Plaintiffs are young children. For purposes of Defendants' Motion to Dismiss, the Court cannot say as a matter of law that the detentions here were reasonable. Defendants make no further arguments respecting Plaintiffs' pleading of their false imprisonment claim. Accordingly, Defendants' Motion to Dismiss the claim against the United States is **DENIED**.

### iii.   *Intentional Infliction of Emotional Distress*

To plead intentional infliction of emotional distress ("IIED") in California, a plaintiff must plausibly allege: "(1) extreme and outrageous conduct by the defendant; (2) the defendant's intention of causing, or reckless disregard of the probability of causing, emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Robles v. Agreserves, Inc.*, 158 F. Supp. 3d 952, 977 (E.D. Cal. 2016) (citing *Hughes v. Pair*, 46 Cal. 4th 1035, 1050–51 (Cal. 2009)).

Defendants argue that "because the FBI agents were executing valid warrants and did not use unreasonable force, they did not engage in 'extreme and outrageous conduct' as a matter of law." Motion at 14.  Defendants argue the agents took reasonable precautions to ensure their safety and the safety of others during the search. *Id.* at 15.  Plaintiffs respond that the agent's conduct "is sufficiently extreme and outrageous to satisfy the pleading requirements for intentional infliction of emotional distress under California law." Oppo. at 17.  Plaintiffs further assert that "[i]t will be argued that the actions of the FBI agents and U[nited States] was intentionally designed to terrorize the father into talking because the criminal case was extremely weak." *Id.*

Again, Defendants rely on their arguments that the warrants were valid and that they did not use unreasonable force.  However, at this stage in proceedings, neither of those contentions are settled facts.  As such, for the same reasons stated *supra*, the Court rejects Defendants' arguments that their conduct was reasonable based on the warrants.  The allegations that agents, while executing warrants related to financial and non-violent crimes, continued to aim firearms at a mother and her young children after determining that they presented no threat—along with the bright lights, bullhorns, and attack canines— present a plausible inference that the agents' conduct was extreme and outrageous for purposes of Plaintiffs' IIED claim.  Whether that was actually the case is for the jury to decide.  Defendants make no further arguments respecting the remaining elements of this claim.  Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' claim

1  for IIED against the United States.

2      **C.** ___*Bivens* Claim___

3      Defendants argue Plaintiffs' *Bivens* claim fails because unlike in *Bivens*, "the FBI

4  agents here were acting pursuant to duly authorized federal warrants, and therefore the

5  'legal mandate under which [they were] operating' was fundamentally different."  Motion

6  at 18 (quoting *Annappareddy v. Pascale*, 996 F.3d 120, 135 (4th Cir. 2021)).  Defendants

7  further contend that the agents were justified in temporarily detaining Plaintiffs because

8  they were executing a valid arrest warrant.  Motion at 17–18.  Defendants also argue that

9  several factors caution against Plaintiffs' *Bivens* claim, including the potential risk to

10 officers and residents during the execution of residential search warrants.  *Id.* at 18.

11 Defendants explain that it would upset the balancing factors Congress considered in

12 allowing FTCA remedies for individuals alleging tortious conduct by federal officers.  *Id.*

13 at 18–19.

14     Plaintiffs argue that like the FTCA claims, the *Bivens* claim also requires a

15 determination of why the force used was reasonable based on the Supreme Court's

16 balancing test set forth in *Graham*.  Oppo. at 7.  Plaintiffs argue this balancing test "is very

17 fact intensive," and many cases "have held that the conduct employed by Defendants

18 against the minors in this case was objectively unreasonable."  *Id.* at 8–10 (citations

19 omitted).  Plaintiffs further argue that because there were no weapons or safety concerns

20 implicated in Tuchinsky's arrest, Defendants' conduct was not justified.  *Id.* at 10–11.

21 Finally, Plaintiffs argue that whether the arrest warrant was valid is not within the four

22 corners of the FAC and is a disputed question of fact.  *Id.* at 12.  Plaintiffs explain that

23 discovery is necessary to determine these issues and identify the agents.  *Id.*  Plaintiffs are

24 incorrect.

25     As an initial matter, the United States is immune from *Bivens* liability under the

26 doctrine of sovereign immunity.  *Consejo de Desarrollo Economico de Mexicali, A.C. v.*

27 *United States*, 482 F.3d 1157, 1173 (9th Cir. 2007) (citation omitted).  Plaintiffs make no

28 counterarguments in their Opposition and as such, the *Bivens* claim asserted against the

-16-

1    United States is **DISMISSED**.  As to the federal agents, Defendants' Motion to Dismiss

2    requires the Court to evaluate whether Plaintiffs' *Bivens* claim can proceed.  If the Court

3    determines that the *Bivens* claim can proceed, it must examine whether Agent Peterson and

4    the thirty Doe Defendants here, are entitled to qualified immunity.  Here, the Court finds

5    that Plaintiffs' *Bivens* claim cannot proceed.

6                    **i.    *Bivens Framework***

7             In *Bivens*, federal agents "entered [Webster Bivens] apartment and arrested him for

8    alleged narcotics violations."  *Bivens v. Six Unknown Named Agents of Fed. Bureau of*

9    *Narcotics*, 403 U.S. 388, 389 (1971).  "The agents manacled [Bivens] in front of his wife

10   and children, and threatened to arrest the entire family." *Id.*  After searching the apartment,

11   they took Bivens to the federal courthouse, where he was interrogated, booked, and

12   subjected to a visual strip search. *Id.*   The complaint in *Bivens* "asserted that the arrest

13   and search were effected without a warrant, and that unreasonable force was employed in

14   making the arrest . . . ." *Id.*  The Supreme Court held that an individual "claiming to be the

15   victim of an unlawful arrest and search could bring a Fourth Amendment claim for

16   damages against the responsible agents even though no federal statute authorized such a

17   claim." *Hernández*, 140 S. Ct. 735, 741 (2020) (describing *Bivens*).

18           The Supreme Court has extended *Bivens* only twice.  First, in *Davis v. Passman*, to

19   imply a remedy under the Fifth Amendment when a congressman allegedly fired a female

20   staffer on the basis of sex.  442 U.S. 228 (1979).  Second, in *Carlson v. Green*, where

21   prison officials failed to provide proper medical care to the decedent in violation of the

22   Eighth Amendment.  446 U.S. 14 (1980).  Since then, the Supreme Court has declined to

23   extend *Bivens* on twelve separate occasions.[4]

24   _____

25   [4]      *See Chappell v. Wallace*, 462 U.S. 296 (1983); *Bush v. Lucas*, 462 U.S. 367 (1983);
     *United States v. Stanley*, 483 U.S. 669 (1987); *Schweiker v. Chilicky*, 487 U.S. 412 (1988);
26   *FDIC v. Meyer*, 510 U.S. 471 (1994); *Correctional Services Corp. v. Malesko*, 534 U.S.
     61 (2001); *Wilkie v. Robbins*, 551 U.S. 537 (2007); *Hui v. Castaneda*, 559 U.S. 799 (2010);
27   *Minneci v. Pollard*, 565 U.S. 118 (2012); *Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017);
28   *Hernández v. Mesa*, 140 S.Ct. 735 (2020); *Egbert v. Boule*, 142 S. Ct. 1793 (2022).

Most recently, in *Egbert v. Boule*, the Supreme Court held that no *Bivens* remedy existed, even though the case involved a claim for excessive force under the Fourth Amendment and bore facts akin to *Bivens* itself.  142 S. Ct. 1793, 1800 (2022).  There, Border Patrol Agent Egbert entered Boule's property, suspecting Boule's involvement in housing illegal immigrants.  *Id.* at 1801.  When Boule asked Egbert to leave his property, Egbert declined and threw Boule into a vehicle and then to the ground.  *Id.*  The Supreme Court rejected the Ninth Circuit's position that a *Bivens* claim could proceed for two reasons: (1) that interfering with the conduct of border patrol agents has national security implications; and (2) that an alternative remedy existed.  *Id.* at 1804–1808.

*Egbert* also laid out the two-step inquiry required for a *Bivens* analysis.  "First, we ask whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningful[ly]' different from the three cases in which the Court has implied a damages action[?]"  *Egbert*, 142 S. Ct. 1793 at 1803 (citing *Abbasi*, 137 S. Ct. at 1859–60).  "Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'"  *Egbert*, 142 S. Ct. at 1803 (quoting *Abbasi*, 137 S. Ct. at 1858).   "If there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy."  *Egbert*, 142 S. Ct. at 1803 (quoting *Hernández*, 140 S. Ct. at 743).

Although the two-step inquiry appears seemingly straightforward, the Supreme Court added that "[w]hile our cases describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy."  *Egbert*, 142 S. Ct. at 1803.  The Supreme Court then cited *Abbasi* as an example, noting how there, the Court explained that "a new context arises when there are 'potential special factors that previous *Bivens* cases did not consider.'"  *Id.* at 1803 (quoting *Abassi*, 137 S.Ct. at 1860).  As a result, even if the *Bivens* claim does not appear to create a new context on its face, certain special factors should be considered before moving to the second step.

-18-

1   Although the Supreme Court has yet to overturn *Bivens*, it has made clear "that

2   recognizing a cause of action under *Bivens* is a 'disfavored judicial activity.'" *Egbert*, 142

3   S. Ct. at 1803 (quoting *Abbasi*, 137 S. Ct. at 1843); *see also Hernández*, 140 S. Ct. at 742–

4   743.  In *Abbasi*, the Court went so far as to say that "in light of the changes to the Court's

5   general approach to recognizing implied damages remedies, it is possible that the analysis

6   in the Court's three *Bivens* cases might have been different if they were decided today."

7   137 S. Ct. at 1856.  With this backdrop, the Court proceeds to the "new context" analysis.

8              ii.    *New Context*

9   A "new context" is one in which the case is "different in a meaningful way from

10  previous *Bivens* cases decided by the [Supreme Court]."  *Abbasi*, 137 S. Ct. at 1859

11  (emphasis added).  In *Abbasi*, the Supreme Court explained that:

12

13  A case might differ in a meaningful way because of the rank of the officers
    involved; the constitutional right at issue; the generality or specificity of the

14  official action; the extent of judicial guidance as to how an officer should
    respond to the problem or emergency to be confronted; the statutory or other

15  legal mandate under which the officer was operating; the risk of disruptive
    intrusion by the Judiciary into the functioning of other branches; or the

16  presence of potential special factors that previous *Bivens* cases did not
    consider.

17

18

19  *Id.* at 1860.

20  Defendants' primary argument is that this case creates a "new context" under *Bivens*

21  because here, the FBI agents were acting pursuant to warrants, whereas in *Bivens*, the arrest

22  was warrantless.  In their briefing, the parties dispute whether the warrants were valid, with

23  Defendants asserting validity and Plaintiffs arguing invalidity.  However, the Court is

24  confined to the four corners of the FAC, which does not categorize the warrants as valid or

25  invalid.  Given the FAC's silence on the issue, whether or not the warrants are valid remains

26  a disputed fact.  Even so, the FAC does mention the warrants and as such, the Court can

27  reasonably infer that the FBI agents were conducting Tuchinsky's arrest and the search of

28  the premises pursuant to such.  Here, the allegations supporting Plaintiffs' *Bivens* claim are

-19-

that the FBI agents employed unreasonable force when executing an arrest warrant for Tuchinsky and search warrant for Plaintiffs' home.  Whether the existence of a warrant (even if executed unreasonably) presents a "new context" for a *Bivens* claim has not been expressly decided by the Supreme Court.

In *Ioanes v. Hodges*, the Ninth Circuit found no "new context" where the Internal Revenue Service's ("IRS") Criminal Investigation Division conducted a search of the plaintiff's home and person.  939 F.3d 945, 949 (2018).  There, the plaintiff's husband was being investigated for criminal tax fraud and the IRS was acting pursuant to a search warrant for the couple's residence.  *Id.*  At issue on appeal with respect to *Bivens*, was plaintiff's claim for invasion of bodily privacy.  *Id.*  The agent did not give the plaintiff privacy while using the bathroom (as another agent did with the husband) and made the plaintiff hold up her dress while she was relieving herself.  *Id.* at 950.  The Ninth Circuit found this situation akin to the warrantless strip search of Webster Bivens.  *See id.* at 952.  In discussing the legal mandate under which the officers were operating, the Ninth Circuit stated in a footnote:

> The fact that Agent Noll searched the Ioane residence pursuant to a lawful search warrant, unlike in *Bivens* where the agents were wholly without any warrant, is of no significance. The only Fourth Amendment claim at issue here is Shelly's. With respect to Shelly, Agent Noll conducted a warrantless search of her person.

*Id.*  Likewise, the *Bivens* claim at issue here are those of Plaintiffs and not of Tuchinsky (*i.e.*, the individual named in the arrest warrant).  Based on the allegations in the FAC, the warrant[5] was based on Tuchinsky's alleged criminal activities.  As such, the same reasoning in *Ioane* applies here, because the arrest and search warrants did not involve

---

[5]    The Court also notes that although there was a search warrant for Plaintiffs' residence, the FAC does not allege the confines of that warrant for the Court's consideration.

-20-

1  Plaintiffs and although they resided in the home being searched, the search was allegedly
2  executed in an unreasonable manner.

3  Defendants rely on *Annappareddy v. Pascale*, where the Fourth Circuit distinguished
4  an unreasonable warrantless search from a search conducted with a warrant.  996 F.3d 120
5  (4th Cir. 2021).  There, the *Bivens* claim relied on allegations that a falsified affidavit was
6  submitted to obtain the search warrant, and that evidence was fabricated to support the
7  arrest warrant.  *Id.* at 135–36.  The Fourth Circuit distinguished the case from *Bivens* by
8  explaining that "[s]peaking 'to witnesses, draft[ing] reports, and shar[ing] information with
9  prosecutors and other investigators' are 'information-gathering and case-building
10 activities' that represent 'a different part of police work than the apprehension, detention,
11 and physical searches at issue in *Bivens*.'"  *Id.* at 136 (quoting *Farah v. Weyker*, 926 F.3d
12 492, 499 (8th Cir. 2019)).  The Fifth Circuit set forth a similar holding in *Cantu v. Moody*,
13 where the allegations involved falsified affidavits supporting a warrant.  933 F.3d 414, 423
14 (5th Cir. 2019).  In *Greenpoint Tactical*, the *Bivens* claim at issue also alleged that false
15 statements were made in the affidavit supporting the search warrant.  38 F.4th 555, 564
16 (7th Cir. 2022).  There, the Seventh Circuit cast doubt on *Annappareddy* and *Cantu*,
17 explaining how in the Supreme Court's decision in *Hernández*, which distinguished
18 *Bivens*, the focus was not "on the absence of a search warrant in *Bivens*" and instead,
19 "framed the issue in terms of an unconstitutional arrest and search in the United States,
20 without trying to distinguish among various scenarios involving warrants or different
21 grounds for warrantless searches or seizures."  *Greenpoint Tactical*, 38 F.4th at 564; *see
22 also Hernández*, 140 S. Ct. at 743–44.

23 This Court agrees that falsifying information or evidence to obtain a warrant appears
24 to create a new context for a *Bivens* claim, because information gathering is different police
25 activity than executing a search.  However, the Court also agrees with *Greenpoint
26 Tactical*'s observation that the absence of a warrant has not historically barred a *Bivens*
27 claim, and that the *Hernández* decision focused on the unconstitutional arrest.  This
28 position is also consistent with Ninth Circuit's holding in *Ioane v. Hodges*.

-21-

1    With or without a warrant, a federal agent must conduct a search in a reasonable

2   manner as set forth in the Fourth Amendment.  However, "[w]hen officers obtain a warrant

3   to search an individual's home, they also receive certain limited rights to occupy and

4   control the property . . . ." *San Jose Charter of Hells Angels Motorcycle Club*, 402 F.3d at

5   971 (quoting *Lawmaster*, 125 F.3d at 1349).  This limited degree of control supports

6   Defendants' argument that federal agents were acting under a different legal mandate than

7   the agents in *Bivens*.  In addition, most recently, the Supreme Court in *Egbert* "held that

8   'similar allegations of excessive force,' 'almost parallel circumstances,' or a 'similar

9   'mechanism of injury' as *Bivens* 'are not enough to support the judicial creation of a cause

10  of action.'" *Mejia v. Miller*, 53 F.4th 501, 505 (9th Cir. 2022) (quoting *Egbert*, 142 S. Ct.

11  at 1805.).  Because the federal agents in *Bivens* and here were both bound by the Fourth

12  Amendment's protection against unreasonable search and seizure, the arguable extension

13  of *Bivens* is modest at best.[6]  But the Supreme Court has held that "even a modest extension

14  is still an extension." *Abbasi*, 137 S. Ct. at 1864.

15    This case presents a gray area[7] for the Court but given the repeated narrowing of

16  *Bivens* claims and the holdings in *Egbert* and *Abbasi*, the Court is inclined to agree with

17  Defendants that the FBI agents here were acting, at least to some extent, under a different

18

19  ─────────────

20  [6]    The Court also notes there may be other factors that distinguish this case from *Bivens*
     but again, only addresses those arguments set forth in Defendants' Motion to Dismiss.

21  [7]    The Court finds that several arguments also favor Plaintiffs.  Although the warrants

22  are relevant to the arrest and search of Plaintiffs' home, the alleged Fourth Amendment

23  violations do not arise from the warrants.  Had the warrants been executed in a reasonable

24  manner, the claims alleged in the FAC would fail.  Instead, Plaintiffs are alleging that the
     agents employed excessive force in making Tuchinsky's arrest and searching the home in

25  violation of the Fourth Amendment's protections against unreasonable searches and
     seizures.  But for the unreasonable force, there would be no claims.  Defendants argue that

26  because the agents were acting pursuant to a warrant, the legal mandate under which they
     were operating was fundamentally different.  However, a search warrant alone does not

27  justify an unreasonable use of force during the performance of said search.  Even so, given
     the Supreme Court's findings in *Egbert* and *Abbasi*, the Court concludes that a slight

28  extension is present here.

-22-

legal mandate than the narcotics agents in *Bivens*.  Accordingly, the Court finds that this case presents a "new context" for a *Bivens* claim and proceeds to the special factors argued by Defendants.

### iii.   *Alternative Remedy*

Defendants argue that allowing this Bivens remedy to proceed "would upset the balancing factors that Congress has considered in providing a remedy through the FTCA for individuals allegedly subjected to the tortious conduct of federal law enforcement officers."  Motion at 18–19.  The argument has merit.

In *Carlson*, the Supreme Court compared a *Bivens* remedy to that of the FTCA, holding that the FTCA is "much less effective than a *Bivens* action as a deterrent to unconstitutional acts," because a *Bivens* claim, unlike FTCA claims, can be brought against the individual agent.  446 U.S. at 21–22.  The Court also held that Congress did not attempt to preempt *Bivens* and instead, "views FTCA and *Bivens* as parallel, complementary causes of action."  *Id.* at 19–20.  The Supreme Court further noted the lack of an option for a jury trial and punitive damages under the FTCA, as well as the lack of uniform rules for FTCA claims seeing that tort violations are governed by state law.  *Id.* at 22–23.  If *Carlson* alone dictated this Court's decision, the FTCA would not serve as a sufficient alternative remedy.  However, Plaintiffs' *Bivens* claim must satisfy "the prevailing 'analytic framework' prescribed by the last four decades of intervening case law."  *Egbert*, 142 S. Ct. at 1809 (citing *Abbasi*, 137 S. Ct. at 1859).

*Egbert* avoided addressing the issue head on.  Instead of focusing on the plaintiff's FTCA remedies, the Supreme Court focused on the plaintiff's use of Border Patrol's administrative grievance process.  And although *Carlson* has not been explicitly overruled, the Supreme Court's subsequent decisions have discarded as irrelevant several aspects of *Carlson*'s FTCA analysis.  In *Schweiker v. Chilicky*, the Court held that even the absence of a statutory remedy does not necessarily mean that courts should imply a *Bivens* action for monetary damages.  487 U.S. at 421–22.  In *Bush v. Lucas*, the Supreme Court found remedial measures sufficient even though they "were not as effective as an individual

-23-

damages remedy and did not fully compensate [the plaintiff] for the harm he suffered." 462 U.S. at 372–73, 385–86.  Both of these holdings minimize the Supreme Court's analysis in *Carlson* comparing the effectiveness of an FTCA remedy to that of *Bivens*.  In addition, the Supreme Court in *Malesko* viewed state law tort remedies as sufficient alternative relief.  534 U.S. at 73.  The *Malesko* holding negates *Carlson*'s concern over the FTCA's varying state laws and lack of uniform federal relief.

The Supreme Court, however, has not explicitly overruled its previous findings of Congressional intent with respect to an FTCA remedy in the context of *Bivens*.  For example, despite *Malesko*'s conclusion regarding state law tort remedies, the decision also reiterated certain findings in *Carlson*, stating: "We also found it 'crystal clear' that Congress intended the FTCA and *Bivens* to serve as 'parallel' and 'complementary' sources of liability."  534 U.S. at 68 (citing *Carlson*, 446 U.S. at 19–20).  Justice Sotomayor, concurring in judgment, further noted that the majority in *Egbert* did not accept Agent Egbert's argument that the FTCA served as an alternative remedy.  *Egbert*, 142 S. Ct. 1793 at 1822 n.7 (J. Sotomayor concurring in part).  The concurrence cited the history of the Supreme Court's findings that Congress intended the FTCA to serve as a parallel remedy to *Bivens*.  Even so, in *Hernández*, the Supreme Court noted:

> The [FTCA] also permits claims "brought for a violation of the Constitution." 28 U.S.C. § 2679(b)(2)(A).  By enacting this provision, Congress made clear that it was not attempting to abrogate *Bivens*, but the provision certainly does not suggest, as one of petitioners' *amici* contends, that Congress "intended for a robust enforcement of *Bivens* remedies."  Instead, the provision simply left *Bivens* where it found it. It is not a license to create a new *Bivens* remedy in a context we have never before addressed . . . .

140 S. Ct. at 748 n.9 (citations omitted).  Based on the language in *Hernández*, the Supreme Court does not view the FTCA as a basis for courts to extend *Bivens* in a new context.

Here, the FTCA claims are permitted against the United States only because they are alleged as intentional torts committed by federal agents "empowered by law to execute

-24-

searches, to seize evidence, or to make arrests for violations of federal law." *See* 28 U.S.C. § 2780(h).  Given the Supreme Court's continual narrowing of *Bivens* remedies in a new context, however, an analysis of this distinction appears futile.  *See Egbert*, 142 S. Ct. at 1810 ("Sometimes, it seems, this Court leaves a door ajar and holds out the possibility that someone, someday might walk through it even as it devises a rule that ensures no one ... ever will.") (J. Gorsuch concurring in judgment) (internal quotation marks and citations omitted).  After all, the alternative remedy need not be as effective as a *Bivens* remedy, nor are remedies even required to exist.

Because the existence of a warrant in this case provides a modest extension of *Bivens*, the alternative remedy available through the FTCA constitutes a special factor that forecloses Plaintiffs' *Bivens* claim.  *See Egbert*, 142 S. Ct. at 1804 (quoting *Abbasi*, 137 S. Ct. at 1858) ("If there are alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'").  Based on the language in *Hernández*, this Court cannot base an extension of *Bivens* on the FTCA's remedial shortcomings.  This conclusion is further supported by recent Ninth Circuit precedent in *Mejia*, where the Court refused to extend *Bivens* and held that while the "FTCA claims are based on a different legal theory, in Mejia's instance they are an alternative avenue to seek damages for the injuries alleged in her *Bivens* claim."  53 F.4th at 506–07.

There is a long and complicated history of Supreme Court decisions limiting extensions of *Bivens*, and that history includes varying interpretations of the FTCA and other alternative remedies.  As stated in *Egbert*, "[i]f there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy." *Egbert*, 142 S. Ct. at 1803 (quoting *Hernández*, 140 S. Ct. at 743).  Given that an alternative remedy exists in some form—along with the Supreme Court's subsequent limitations of *Carlson*'s FTCA analysis—there are reasons to pause.  Without further Supreme Court guidance, this Court cannot say that the case at hand presents the rare exception that would allow a *Bivens* extension.  *See Mejia*, 53 F.4th at 506 (citing *Egbert*, 142 S. Ct. at 1802)

-25-

("Under *Egbert*, rarely if ever is the Judiciary equally suited as Congress to extend *Bivens* even modestly. The creation of a new cause of action is inherently legislative, not adjudicative."). Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' *Bivens* claim. Because the *Bivens* claim is dismissed, the Court **DENIES** as moot Defendants' Motion to Dismiss the claim on qualified immunity grounds.

**V.   CONCLUSION**

      The Court rules on Defendants' Motion to Dismiss as follows:

      1.    The Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' FTCA claims against Agent Peterson and Doe Defendants.

      2.     The Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' FTCA claims for assault against the United States.

      3.    The Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' FTCA claims for battery against the United States.

      4.    The Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' FTCA claims for false imprisonment against the United States.

      5.    The Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' FTCA claims for IIED against the United States.

      6.    The Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' Fourth Amendment *Bivens* claim against all Defendants.

      7.    The Court **DENIES** as moot Defendants' Motion to Dismiss Plaintiffs' *Bivens* claim against Agent Peterson and Doe Defendants based on qualified immunity.

      **IT IS SO ORDERED.**

DATED:   March 10, 2023

                                       **HON. ROGER T. BENITEZ**
                                       United States District Judge