**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MT, a minor by and through his Guardian Ad Litem VIKTORIIA ZUBKOVA; AT a minor by and through his Guardian Ad Litem VIKTORIIA ZUBKOVA; and LEYLA BOROVIK,<br><br>                    Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>                    Defendant. | Case No.:  3:22-cv-00171-BEN-KSC<br><br>**ORDER: (1) DENYING DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT; and (2) GRANTING THE PARTIES' JOINT MOTION TO PRECLUDE TESTIMONY**<br><br>**[ECF Nos. 30 and 38]** |

## I.      INTRODUCTION

Plaintiffs Leyla Borovik, and both MT and AT, minors by and through their Guardian Ad Litem Viktoriia Zubkova, bring this action against Defendant the United States of America (the "United States"). ECF No. 38.  Before the Court is the United States' Motion for Summary Judgment.  ECF No. 10.  The Motion was submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure. *See* ECF No. 41.  After considering the papers submitted, supporting documentation, and applicable law, the Court **DENIES** the Motion for

Summary Judgment. The parties also submit a Joint Motion to Preclude the Testimony of Yevgeny Tuchinsky, which this Court **GRANTS**.

## II.  BACKGROUND

This case arises from alleged events that occurred during a raid by the Federal Bureau of Investigation ("FBI") of Plaintiffs' home.

### A.  Statement of Facts

The facts set forth in the United States' Motion for Summary Judgment paint a starkly different picture than those alleged by Plaintiffs. *See* ECF No. 38 at 3–7. The factual theories asserted by both parties are summarized below per the evidence submitted.

On October 24, 2019, Yevgeny Tuchinsky was indicted on various counts of conspiracy, wire fraud, and money laundering related to the alleged bribery of a Federal Express employee. Apparently, payments were received for Federal Express runs that never occurred, and through falsifying mileage reports. *See* ECF No. 38, Ex. A. On October 25, 2019, at 6:00 a.m. (or before it was light out), the FBI executed warrants to arrest Tuchinsky and search his property.[1] *See* Deposition of Agent Steven Hoogland, ECF No. 38-5 ("Hoogland Depo. I") at 6–7; Deposition of Leyla Borovik, ECF No. 39-4 ("Borovik Depo. I") at 2. At the time of the search, Tuchinsky was home with his wife, Leyla Borovik, and his two young children, AT and MT. At the time of the search, AT was eight years old at the time and MT was six years old.

The circumstances of how exactly the warrants were executed remain in dispute, including the number of agents both inside and outside the home,[2] the number and type of firearms utilized by the agents, the manner in which the agents conducted themselves, and whether a police canine was present. However, the parties appear to agree that Tuchinsky peacefully answered the door, that he was cooperative with agents, and that his arrest

---

[1]  The items to be seized on the warrant included three vehicles, various pieces of jewelry, and one rifle. ECF No. 38, Ex. C at 4.

[2]  The Operations Report lists twenty-four total FBI agents as participants in the operation, but the parties did not clarify whether all of those agents entered the home and at what time(s). ECF No. 38, Ex. E.

-2-

occurred without any attempt to evade or harm the agents. *See* Hoogland Depo. I at 7. The record also shows no argument or allegation that any of the Plaintiffs were uncooperative during the execution of the warrants. The parties next agree that after Tuchinsky peacefully opened the door, MT came out of his room and was the first Plaintiff to make contact with the agents. Borovik was the second Plaintiff to emerge from her room, followed by AT. However, the parties dispute the exact circumstances of each Plaintiffs' initial and continued contact with the agents throughout the duration of the search.

Agent Steven Hoogland stated that MT came out of his room almost immediately with his father, appearing before Hoogland even entered the home. Hoogland Depo. I at 8, 9. Agent Rebekah Frank claimed that she witnessed agents with Tuchinsky in the doorway and MT ran outside to the yard in his pajamas. *See* Deposition of Rebekah Frank, ECF No. 38-7 at 5. Agent Frank claimed she holstered her weapon and grabbed MT for his safety before turning him away from seeing his father being arrested. *Id.* at 6. Agent Frank also stated that she stayed outside with MT until the first part of the house was cleared before bringing him back inside. *Id.* at 7–8. Agent Frank did not recall many of the details, including whether she explained what was happening to MT, whether another agent was with her and MT, or the timing of events. *See id.* at 6–8.

MT, however, claimed that he came out of his room to people yelling and pointing "big guns" at him. *See* Deposition of MT, ECF No. 39-3 ("MT Depo.") at 3. MT stated that the agents grabbed him "really hard on his shoulder" and pulled him "towards the wall, closet." *Id.* MT explained that people were standing next to him and the person on his rights side was aiming a "really large gun at" him. *Id.* MT claimed he saw his father up against the door being handcuffed, and then his mother came out and the agents "immediately pointed guns at her." *Id.* MT claimed he "started crying because they were pointing guns at [him] and were about to kill [him]." *Id.* MT claimed his older sister, AT, came out next, accompanied by two people. *Id.* at 2. MT said that when she came out "three to four people started pointing large guns at her, as well." *Id.* at 4. Based on the

-3-

above deposition excerpts, there are factual disputes as to whether MT was inside or outside during his father's arrest, to what extent he witnessed the arrest, whether there were one or two agents with him, and whether one agent pointed a large gun at him during the arrest.  There is also a dispute regarding Agent Frank's intent in grabbing MT, the extent to which she "grabbed" him, and whether MT was crying, which Agent Frank does not recall.

As for AT, Agent Hoogland testified at deposition that he opened her door and saw movement in the bed, immediately recognizing that it was a child's room.  Hoogland Depo. I at 13.  Hoogland claimed that his gun was "at a 45-degree angle towards the floor, so it was never pointed at anyone."  *Id.*  Agent Hoogland claimed that Agent Kari Harrison came around his right side, went into the room, took MT by the hand, "and gently pulled her" into the hall.  *Id.*  Agent Hoogland claims another agent cleared AT's room and they went onto the next.  *Id.*  Conversely, AT testified at deposition that she woke up and saw three men telling her to come with them, and that one grabbed her and made her walk. Deposition of AT, ECF No. 39-5 ("AT Depo.") at 3.  AT claimed that in the hallway, she saw people with uniforms, masks, and big guns.  *Id.*  AT explained that "they were holding big guns on me and yelling at me," and "then the person who was grabbing me, he pushed me to my mom."  *Id.*  AT further claimed that she saw her father pushed against the door with a person holding a gun to his back and saw a person grabbing her brother.  *Id.*  When asked if and how the agents were mean to her, she said yes and that "[t]hey were grabbing [her] really tightly, and they were pushing [her] aggressively . . . ."  *Id.* at 7.  AT's recollection of events also differs from Agent Hoogland's, in that she said three men woke her up and one grabbed her.  There is no deposition testimony in the record from Agent Harrison—the person who Agent Hoogland claimed took AT out of bed and into the hall.

Borovik testified at deposition that she was also woken up by loud noises and that she saw light through the door.  Deposition of Leyla Borovik, ECF No. 39-4 ("Borovik Depo. I") at 2.  Borovik opened the door to an armed person dressed in black, with a mask, who was putting a light in her face. *Id.* at 2–3.  Borovik described how she followed agents

-4-

into the hallway—observing them as people in dark clothing—and that they were yelling and screaming at her to raise her arms. *Id.* at 3. Agents took Borovik to the living room, where she saw many of "the same type of people dressed the same way with weapons," who started yelling at her and lifting those weapons. *Id.* Borovik stated: "There was a click of the weapon. They lifted the weapon and they -- and they directed it towards me." *Id.* Borovik claimed that at the same time, she saw MT standing next to her husband, who was in handcuffs, and that "[h]e was pushed towards the open door and the weapons were directed at him." *Id.* at 3. Borovik claimed her son was being held by another person standing there, and that all of them had weapons. *Id.* at 4. In front of her son, Borovik claimed "there was an agent standing who was directing the weapon towards all of us" and "was moving it all around." *Id.* Borovik claimed there was a light on the weapon, "[a]nd in the back, there were [more] people who were directing their weapons." *Id.*

Borovik continued that she again heard loud screams, the agents "again lifted up the weapons," and she again heard the same clicks. *See id.* Borovik then saw her daughter being directed by agents in black, and described how they lifted their weapons towards AT "and started yelling to raise hands." *Id.* At this point, Borovik ran to her daughter and yelled "Don't shoot," taking AT into her arms. *Id.* at 4–5. Borovik observed "maybe three" agents taking her husband into a room with weapons directed at his back. *Id.* at 5.

After this, the timeline of events is not entirely clear. Agent Frank claimed that once the agents swept the house, the children and mother were allowed to freely interact. Frank Depo. at 8. Conversely, MT and AT stated how they and Borovik were pushed into MT's room and closed in. AT Depo. at 3. MT described the agents as aggressively pushing and kicking Plaintiffs into the room. MT Depo. at 4. Borovik also stated that the agents "kind of started pushing" them, so they would go into the room. Borovik Depo. I at 5. MT stated that in the room, they all had really large guns and that he was scared, screaming, and crying. MT Depo. at 4. MT claimed that when he ran up to his mother, "a guy got me and pushed me back onto the bed." *Id.* AT was asked if she was able to talk to her brother while in the room and she stated, "No. I don't think so." AT Depo. at 5. MT estimated

that they were in the room for around two hours, because it was light outside when they came out. MT Depo. at 5. However, at one point, Borovik was taken out of the room by agents. *Id.*

Borovik stated that when in the bedroom, the agents did not allow them to leave. Borovik Depo. I at 5. Later, agents asked Borovik to leave the room and MT started crying and asking her not to leave. *Id.* An agent instructed Borovik to come with him to the second floor, where there was also an interpreter. *Id.* Borovik said that two agents sat very close to her on both sides and one agent sat across from her with a pistol. *Id.* at 6. Borovik said she could see the door to the room her children were in but that the door remained closed. *Id.* Although Borovik did not recall whether she specifically said she wanted the interview to end, she did recall asking about going back to see her children, and that the agents did not really listen to her. *See* Deposition of Leyla Borovik, ECF No. 38-8 ("Borovik Depo. II") at 16.

Agent Frank testified that Borovik was questioned about her Russian ties, including her background, living experience, and whether she was a mail-order Russian bride. Frank Depo. at 9, 12. Agent Frank was not the interviewing agent but testified that she was not aware of any connection to Borovik's Russian ties and Tuchinsky's alleged crimes. Frank Depo. at 13. Agent Hoogland also stated his assumption that Borovik was not involved in Tuchinsky's alleged crimes. Deposition of Agent Hoogland, ECF No. 39-7 ("Hoogland Depo. II") at 3. After Borovik was questioned, she claims an agent instructed her to "go and prepare breakfast for the children," so they went downstairs and Borovik began making breakfast. Borovik Depo. I at 6. It was around this time that agents came out with the children. *Id.*

There is also testimony stating that the children were taken to their playroom, but the timing and circumstances surrounding the playroom are in dispute. Agent Frank recalled the children laughing and playing in the playroom at one point. Frank Depo. at 18. Agent Wetterer stated that she was in the playroom with the children, and that they were coloring, playing with stuffed animals, and maybe throwing a ball in the hallway.

-6-

Deposition of Agent Laura Wetterer, ECF No. 38-9 ("Wetterer Depo.") at 7. Agent Wetterer could not provide specifics as to how the children got to the playroom but said that it was her assignment to sit with the children while Borovik was being interviewed. *Id.* at 7–8. MT, however, testified that he and AT did not play in the playroom, and that the agents were not nice to them. MT Depo. at 7.

As a whole, there are several inconsistencies between Plaintiffs' testimony and the agents. Plaintiffs clearly stated how the agents yelled at them, grabbed them, pushed them, locked them in a room, and aimed large guns at them. Yet the agents testified that once the house was cleared, Plaintiffs were allowed to freely move and interact within the home. It is also not clear how long guns were held on each Plaintiff and when exactly the house was cleared—whether it was before or after Plaintiffs were taken to the bedroom. MT repeatedly testified that agents aimed large guns at Plaintiffs. He also stated that some agents "had tiny guns, and some of them had large guns." MT Depo. at 6. AT's testimony also referenced multiple large guns. *See* AT Depo. at 3. However, Agent Hoogland testified that to his belief, he was the only agent with a long (*i.e.*, large) gun, and that after the initial safety sweep, he put the gun in the trunk of his car, where it remained for the rest of the day. Hoogland Depo. I at 13, 15.

Also disputed is Plaintiffs testimony that they MT and AT were screaming and/or crying at different points in time. Agents Hoogland and Frank denied witnessing either of the children crying, and Agents Frank and Wetterer testified that the children were playing. AT and Borovik also testified to seeing a German Shepherd canine in a police vest with a person (who they perceived as an agent) outside the home. Borovik Depo. I at 8; AT Depo. at 8–9. Agent Hoogland, however, testified that no canines were used, and that the FBI has no canines. Hoogland Depo. I at 14, 15. Agent Frank also testified that there were no canines present. Frank Depo. at 16–17. The parties even dispute the children's breakfast—Agent Frank claimed the children were fed caviar, *see* Frank Depo. at 11, while MT and Borovik claimed they ate porridge. *See* MT Depo. at 5; Borovik Depo. II at 19.

3:22-cv-00171-BEN-KSC

## B.    Procedural History

On February 7, 2022, Plaintiffs filed their original Complaint and on February 16, 2022, Plaintiffs filed their First Amended Complaint.  ECF No. 4 ("FAC").  The FAC alleged claims pursuant to the Federal Tort Claims Act for assault, battery, false imprisonment, and intentional infliction of emotional distress ("IIED"), as well as a *Bivens* civil rights violation.  ECF No. 4.  On May 25, 2022, Defendants filed a Motion to Dismiss, *see* ECF No. 10, which this Court granted-in-part.  ECF No. 14.  The Court dismissed Plaintiffs' *Bivens* claim entirely and dismissed Plaintiffs' FTCA tort claims made against an individual agent and Doe Defendants.  However, the FTCA tort claims against the United States proceeded to litigation.  Discovery commenced.

On December 15, 2023, the United States filed a Motion for Summary Judgment. ECF No. 38.  Plaintiffs filed an Opposition, *see* ECF No. 39, and the United States filed a Reply, *see* ECF No. 40.  The parties also filed a Joint Motion seeking to preclude the testimony of Yevengy Tuchinsky.  ECF No. 38.

## III.    MOTION FOR SUMMARY JUDGMENT

The United States seeks an order granting summary judgment on the remaining tort claims brought pursuant to the FTCA.  Plaintiffs' opposition disputes the facts set forth by the United State and seeks an order denying summary judgment.

## A.    Legal Standard

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  A fact is material if it could affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence, viewed in light most favorable to the non-moving party, "is such that a reasonable jury could return a verdict for the non-moving party."  *Id*.  "The moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.

-8-

2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the moving party meets its burden, the non-moving party must go beyond the pleadings to establish a genuine issue of material fact, using affidavits, depositions, answers to interrogatories, admissions, and specific facts.  *Ford Motor Credit Co. v. Daugherty*, 270 F. App'x 500, 501 (9th Cir. 2008) (citing *Celotex*, 477 U.S. at 324); *see also* Fed. R. Civ. P. 56(c)(1)(A) (purported factual disputes must be accompanied by "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials").

"The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor."  *City of Pomona*, 750 F.3d at 1049.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). However, the non-moving party's mere allegation that factual disputes exist between the parties will not defeat an otherwise properly supported motion for summary judgment.  *See* Fed. R. Civ. P. 56(c); *see also Phytelligence, Inc. v. Washington State Univ.*, 973 F.3d 1354, 1364 (Fed. Cir. 2020) ("Mere allegation and speculation do not create a factual dispute for purposes of summary judgment.") (quoting *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996)).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

**B.**    **Discussion**

Plaintiffs allege assault, battery, false imprisonment, and IIED.  The United States argues that based on the record, Plaintiffs cannot succeed on their claims because the record fails to prove the officers use of force was unreasonable.  The Court disagrees.

**i.**    ***Federal Tort Claims Act***

Plaintiffs' four tort claims are made against the United States pursuant to the FTCA. Because the alleged conduct giving rise to the claims occurred in San Diego County and fall under the FTCA, the Court must apply California tort law.  *See Avina v. United States*,

-9-

681 F.3d 1127, 1130 (9th Cir. 2012) (citing *Richards v. United States*, 369 U.S. 1, 7 (1962)) ("Because the [Plaintiffs'] tort claims are brought under the FTCA, and the events at issue occurred in California, we apply California tort law."). In addition, given that this case involves the conduct of FBI agents, acting in their official capacities, Plaintiffs must further "establish, for each cause of action, that the officers used 'unreasonable force.'" *Avina*, 681 F.3d at 1131 (citing *Munoz v. City of Union City*, 120 Cal. App. 4th 1077 (2004)). "In California, '[c]laims that police officers used excessive force in the course of an arrest, investigatory stop or other seizure of a free citizen are analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution.'" *Id.*

To determine whether the force used is "objectively reasonable," the Court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Although the right to use some degree of physical coercion to make an arrest is well established, "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). As such, "proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). "The most important factor under *Graham* is whether the suspect posed an immediate threat to the safety of the officers or others." *Est. of Stanley v. City of San Jose*, No. 22-cv-03000-VKD, 2022 WL 16837050, at *4 (N.D. Cal. Nov. 9, 2022) (quoting *Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017)). Here, the parties essentially dispute whether the force employed during the search of Plaintiffs' home was objectively reasonable.

### a.    Assault and Battery

In California, the elements of assault require that: "(1) defendant acted with intent to cause harmful or offensive contact, or threatened to touch plaintiff in a harmful or

-10-

offensive manner; (2) plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the threat; (3) plaintiff did not consent to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a substantial factor in causing plaintiff's harm." *So v. Shin*, 212 Cal. App. 4th 652, 668–69 (2013), *as modified on denial of reh'g* (Jan. 28, 2013) (citations omitted).  To state a claim for battery in California, a plaintiff must allege that: "(1) defendant touched plaintiff, or caused plaintiff to be touched, with the intent to harm or offend plaintiff; (2) plaintiff did not consent to the touching; (3) plaintiff was harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's position would have been offended by the touching." *Shin*, 212 Cal. App. 4th at 669.

Although assault and battery are two separate claims, the sticking point here is whether Plaintiffs reasonably believed they were about to be touched, and/or were actually touched in a harmful or offensive manner, *and* in a way that constitutes excessive force under the Fourth Amendment.  The United States points to testimony in the record that indicates the agents conducted an objectively reasonable search.  Although certain touching occurred, the testimony of Agent Hoogland, Agent Frank, and Agent Wetterer all indicate that any grabbing of the children was done in a calm manner and for the purpose of keeping everyone safe.  However, Plaintiffs point to other evidence indicating that offensive touching did occur, because guns were held on them despite their cooperation.  Plaintiffs' evidence also describes how they were aggressively pushed, grabbed, and as MT testified, even kicked.  Plaintiffs do not simply claim there are disputes of fact and instead, submit deposition testimony supporting many of their arguments, including the testimony of MT, AT, and Borovik.  Because Plaintiffs are non-moving parties, the Court must view the evidence in the light most favorable to them, drawing all reasonable inferences in their favor. *City of Pomona*, 750 F.3d at 1049.

Even so, despite evidence of harmful or offensive touching, the search of the home could still be considered objectively reasonable, depending on the circumstances. Plaintiffs rely on two cases to support the denial of summary judgment based on their version of the

-11-

facts.  First, *Avina v. United States*, where the Ninth Circuit found issues of material fact as to whether agents used excessive force against two minor children and an adult male during the search of a home.  *Avina*, 681 F.3d at 1132–33.  The agents had obtained a search warrant for a mobile home, believing the vehicle belonged to a suspected drug trafficker. *Id.* at 1128–29. The agents later discovered they wrote down the wrong license plate number.  *Id.* at 1129. In analyzing the plaintiffs' FTCA claims for assault and battery, the Court found that the force used against the adult male resident (*i.e.*, forcefully pushing him to the ground) was reasonable, because: (1) it was done during the initial minutes of the search; (2) the man was not following the agents' instructions; and (3) the agents had no way of knowing that the man was not the suspected drug trafficker or an associate.  *Id.* at 1132.  As to the minor children, however, the Court stated:

> [A] jury could find that the agents pointed their guns at the head of an eleven-year-old girl, "like they were going to shoot [her]," while she lay on the floor in handcuffs, and that it was excessive for them to do so. Similarly, a jury could find that the agents' decision to force the two girls to lie face down on the floor with their hands cuffed behind their backs was unreasonable.

*Id.* at 1132–33.

Second, Plaintiffs rely on *Motley v. Parks*, where the Ninth Circuit examined whether a law enforcement officer was justified in pointing a gun at an infant during the search of a home, stating:

> While it may have been reasonable for Kading to have drawn his firearm during the initial sweep of a known gang member's house, his keeping the weapon trained on the infant, as he was alleged to have done, falls outside the Fourth Amendment's objective reasonableness standard. Motley has stated a constitutional violation.

432 F.3d 1072, 1089 (9th Cir. 2005), *overruled on other grounds by United States v. King*,

-12-

687 F.3d 1189 (9th Cir. 2012).  The time period at issue in *Motley* was around 20 minutes. *Id.* at 1076. *Motely*'s holding therefore hinted at the potential timeframe during which an officer may point a gun at a young occupant of a residence being searched.  In its analysis, *Motley* also discussed *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992), where the Seventh Circuit held that holding a gun to the head of a nine-year-old and threatening to pull the trigger was objectively unreasonable, given that the child was not a suspect and did not attempt to evade officers.  *Motley*, 432 F.3d at 1089 (citing *McDonald*, 966 F.2d at 295).  Both cases are somewhat are applicable here, given the age of AT and MT, and the alleged aiming of the firearms at these minor children.

Turning to the evidence, there is deposition testimony from Borovik and her children that guns were pointed at them despite them being cooperative and subdued by agents.  MT testified that while watching his father arrest, the agents grabbed him really hard on his shoulder, pulled him towards the wall, and that the agent on his right was pointing a really large gun at him.  *Id.* at 4.  A six-year-old child crying and in pajamas could hardly be read as a threat, but MT stated that a gun was pointed at him even after he had been subdued by the agents.  The agents appeared to recognize MT as a young child based on their deposition testimony.  Whether the agents intended to protect MT or scare him through the use of firearms and threatened force creates a dispute of material fact as to the assault claim.  In addition, Borovik testified that she heard the guns click while pointed at both her and her daughter, AT.[3]  When the gun pointed at AT clicked, Borovik explained that she yelled "Don't shoot" and ran to her daughter.  Borovik's testimony indicates a reasonable fear that she and her daughter were going to be shot by agents.[4]  This seemingly occurred after Tuchinsky was cooperatively placed in handcuffs, and after the agents recognized that AT was a child, given that AT had already been woken up and subdued by agents.  Agent Hoogland specifically stated how he immediately recognized AT's room as that of a child before AT was pulled out of bed.

---

[3]  MT also testified to seeing three to four people pointing guns at AT.
[4]  Borovik also witnessed guns being directed at MT.

A jury may find it objectively unreasonable to hold a subdued and crying six-year-old child at gunpoint.  The same is true for eight-year-old AT and the number of agents pointing firearms at her, despite her young age and non-threatening disposition.  Even Borovik was apparently cooperative but testified that one agent was holding a gun on all of them moving it around, inferring again that Borovik had a reasonable fear she would be shot by the agents.  The United States argues that agents were within their rights to aim firearms at the Plaintiffs during the initial sweep of the home.  The United States relies on Borovik's deposition testimony to argue that "no agent grabbed either of the children out Borovik's arms, 'tagged' anyone with a laser from an 'assault weapon,' or otherwise touched them with any intent to harm."  ECF No. 38 at 9.  Instead, the United States argues that "Plaintiffs were free to move about the home, play and eat breakfast."  *Id.*  But Borovik's statement is just one of many in her deposition testimony.  Other statements from Borovik's deposition indicate that she thought agents were going to shoot her and her children—hearing the firearms click and yelling, "Don't shoot.  The United States' also glosses over many of the details Plaintiffs testified to at deposition, not addressing the testimony of AT and MT, which undoubtedly infers Plaintiffs were not free to move within their home during the search.[5]

The United States has not overcome Plaintiffs' genuine disputes of material fact.  This is especially true given the young age of AT and MT, and because all Plaintiffs were cooperative, unarmed, subdued by agents, and posed no immediate threat.  *See Graham*, 490 U.S. at 396.  A jury could also consider that Tuchinsky cooperated and was detained almost immediately upon the agents entering the home—and that the underlying crimes giving rise to the warrants were financial and not violent in nature.  The agents were aware that Tuchinsky had a rifle and expected to find it in the home (though he informed agents the rifle was in Utah).  However, whether this fact alone is sufficient to warrant the conduct

---

[5]    Borovik was also taken from her children and interviewed about Russian connections that, based on the current record, were not related to the underlying crimes or warrants.

-14-

Plaintiffs testified to is a question of fact for the jury. It is also unclear when exactly the initial safety sweep of the home concluded and how long guns were pointed at each individual Plaintiff. As such, there are genuine disputes of fact material preventing the Court from resolving the assault claim.

The same is true with respect to the children's alleged battery claim. There are clear disputes of fact as to whether MT and AT were aggressively grabbed, pushed, and/or kicked, given their testimony and the testimony of the agents. The United States argues that Plaintiffs' evidence is unsupported by the record but focuses only on the agents' and Borovik's testimony. The United States fails to address MT and AT's testimony altogether and simply points to contradictory evidence that agents were kind and gentle with the children. A jury could find that aggressively pushing and/or kicking cooperative, unarmed, and particularly young children constitutes an unreasonable use of force with respect to their battery claim.

The Court does note, however, that the battery claim as to Borovik is more nuanced. Although Borovik stated that no agent grabbed the children from her arms, the children both testified that the agents aggressively grabbed and pushed *all* Plaintiffs into the bedroom. Borovik also testified to that she remembers the sensation of being pushed into the room, but that they were all in shock. Borovik Depo II. At 12. Drawing all reasonable inferences in Plaintiffs favor, *see City of Pomona*, 750 F.3d at 1049, Borovik was pushed and closed in the room, and later taken by agents for questioning. This was done despite the agents' assumption that Borovik was not involved in the underlying crimes. Again, this all seemingly occurred despite Borovik posing no threat to agents, and after the initial safety sweep. *See Est. of Stanley v. City of San Jose*, No. 22-cv-03000-VKD, 2022 WL 16837050, at *4 (N.D. Cal. Nov. 9, 2022) (quoting *Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017)) ("The most important factor under *Graham* is whether the suspect posed an immediate threat to the safety of the officers or others.").

Although the record before the Court presents a bit of a close call here, as stated in *Avina*:

-15-

> Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.

*Avina*, 681 F.3d at 1130 (quoting *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011)). Here, the Court likewise finds too many conflicting factual contentions and gaps in the record to warrant summary judgment, particularly because the evidence must be viewed in the light most favorable to Plaintiffs. Given the heavily contested factual record before the Court, a jury could find for Borovik, as well as AT and MT, on the battery claim.

The burden was on the United States to prove there was no genuine dispute of material fact with respect to the assault and battery claims.[6] It has failed to make that showing in light of Plaintiff's evidence, which indicates that the force employed may not have been objectively reasonable. The Court cannot simply accept one party's version of the events or fill the in the gaps regarding the timeline *sua sponte*. Accordingly, the Court **DENIES** the United States' Motion for Summary Judgment as to Plaintiffs' assault and battery claims.

### b.    False Imprisonment

In California, a false imprisonment claim requires three elements: "(1) the non-consensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Lyons v. Fire Ins. Exchange*, 74 Cal. Rptr.

---

[6]    The United States does cite several cases as parentheticals but provides little analysis and does not explain how certain distinguishable cases are applicable here. For example, the United States appears relies on *Los Angeles County v. Rettele*, 550 U.S. 609 (2007), arguing that Plaintiffs do not attempt to distinguish this case. However, in *Rettele*, the minor was 17 years old, not an obvious child, and the deputies left the home after no more than 15 minutes. *Id.* at 615. The primary similarity is that the crime was non-violent in nature. Here, the children were much younger, and the agents remained at the house for several hours. As such, *Rettele* is distinguishable.

-16-

3d 649, 655 (Cal. Ct. App. 2008). The United States argues that here, it was acting under the authority of indisputably valid warrants, giving the agents lawful privilege for the alleged confinement. ECF No. 38 at 11. As such, the United States contends that Plaintiffs cannot make a showing of false imprisonment. Plaintiffs counter that the validity of the warrants does not immunize the agents from an otherwise unreasonable search. ECF No. 39 at 6. Plaintiffs contend they were "confined without their consent for an unreasonable period of time." *Id.* at 7. Plaintiffs further contend that while "federal agents may detain persons occupying a home at the outset of a search, continued confinement may become unreasonable at some point"—especially given the young ages of AT and MT. *Id.* at 7. Plaintiffs contend that "the facts demonstrate the mother and children were accosted with firearms numerous times, even after the father was peacefully detained within seconds of the door knock." *Id.*

Plaintiffs are correct that a warrant does not immunize the United States from conducting an otherwise unreasonable search. *See San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 971 (9th Cir. 2005) (quoting *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997)) ("When officers obtain a warrant to search an individual's home, they also receive certain limited rights to occupy and control the property; however, the Fourth Amendment binds the officers such that the right to search a home concomitantly obliges the officers to do so in a reasonable manner."). However, residents are often detained during searches, depending on the circumstances, including the nature of the underlying criminal conduct and the any threat of potential violence. *See Michigan v. Summers*, 452 U.S. 692, 693–705 (1981) (holding that the Fourth Amendment extends limited authority to detain occupants of a residence during a warrant-based search founded on probable cause).

Here, the agents anticipated finding a rifle within the home, which could immunize the agents' conduct up to a certain point. However, the agents' testimony provides the Court with no additional safety concerns and instead, indicates that Plaintiffs posed no threat. Furthermore, the United States disputes Plaintiffs' version of the facts, arguing that

they were free to move around the home once the initial sweep was conducted. To support this proposition, the United States cites the deposition testimony of Agent Wetterer, Agent Frank, and Borovik. Agent Wetterer's testimony explained how she was assigned to sit with the children and recalls playing with AT and MT in the playroom. Agent Frank further testified that she did not remember the children crying at any point and that she specifically remembered the children laughing and playing with an agent in the playroom. The Court also notes Agent Frank's testimony that: (1) after the house was cleared, the agents "absolutely let the mom and the kids interact as they wanted;" and (2) she told Borovik she was free to leave the house if she wanted to.

Conversely Plaintiffs' testimony indicates that they were locked in a bedroom for up to two hours following the initial sweep. MT stated that he was scared, screaming, and crying while in the room, and that he was pushed onto the bed by an agent when he ran to his mother. AT testified that she was not allowed to talk to her brother while in the room, and that she and her brother were crying when Borovik was taken by the agents. The record also shows that Borovik was taken upstairs to be interviewed and questioned about her Russian ties, which, as Agent Frank indicated, did not appear to be connected to Tuchinsky's underlying offenses. Drawing all reasonable inferences in favor of Plaintiffs, it appears that they could move freely within their home or interact with one another throughout the duration of the search.

The United States also cites Borovik's own testimony that she fed her children breakfast before the agents left the home. However, Borovik's testimony is taken somewhat out of context. In the same breath, Borovik further stated that when the agents finished interviewing her, they instructed her to go prepare breakfast for the children, indicating that she did not do so on her own free will. Borovik also observed that her children were still in the bedroom with agents while Borovik was being questioned, and that the door was always closed. This conflicts with Agent Wetterer's testimony that she was playing with the children in the playroom while Borovik was being questioned. Borovik also explained that during the interview, the agents did not really listen to her, and

-18-

at some point, she did say something about wanting to go back and see her children. Based on Plaintiffs' testimony, it seems that armed agents were accompanying and directing Plaintiffs while occupying the home.

Although the agents' conduct could be deemed reasonable, the United States forgets that the Court cannot weigh competing evidence at this stage in the proceedings. Plaintiffs' testimony contradicts the United States' argument that "after the initial safety sweep, Plaintiffs were free to move about the home, play and eat breakfast." *See* ECF No. 38 at 19. The United States has not established that the alleged detention of Plaintiffs was reasonable under the circumstances as a matter of law. There are too many disputes of fact to draw that conclusion. Even more, the timeline of the search and amount of time each Plaintiff was in a particular portion of the home (and with whom) remains unclear. The Court does not know exactly how long the children were locked in the bedroom, or how long agents were even at the home based on conflicting testimony. It is also unclear if the children were confined in the playroom after being taken from the bedroom, and when this occurred.

Moreover, the cases cited by the United States do not make this fact-based inquiry proper for dismissal on summary judgment. For example, in *Muehler v. Mena*, 544 U.S. 93, 99 (2005), the officers had reason to believe that an armed and dangerous gang member also resided at the home of the person being detained, significantly increasing an officer's risk when searching the home. Here, the agents knew that Tuchinsky owned a gun, but they allegedly locked Plaintiffs in a room after Tuchinsky was peacefully arrested. Tuchinsky also told officers the location of the gun, and all Plaintiffs—two of them being minor children—were cooperative and deemed to present no threat. The United States also cites *Dawson v. City of Seattle*, 435 F.3d 1054 (9th Cir. 2006) to support its argument that residents may be detained when the underlying crimes are non-violent in nature. There, Department of Public Health ("DPH") investigators executed search warrants for two boardinghouses that contained extensive rodent and insect infestations. *Id.* at 1057. The investigators were aware that an individual associated with the owner had a violent criminal

-19-

3:22-cv-00171-BEN-KSC

history and had previously threatened DPH personnel. The DPH investigators considered the possibility that this individual might interfere with the evidence or assault an investigator. *See id.* at 1058. Various tenants were detained during the search and four of them brought suit. The *Dawson* Court interpreted the Supreme Court's holding in *Muehler* to mean "that the duration of a detention may be coextensive with the period of a search, and require no further justification." *Id.* (citing *Muehler*, 544 U.S. at 98). However, *Dawson* also sharpened this holding by stating that police do not "have unfettered authority to detain a building's occupants in any way they see fit," noting that the detention must be carried out in a reasonable manner. *Dawson*, 435 F.3d at 1057. This case is distinguishable from the instant matter, given the high risk for violence based on prior threats, and the fact that Plaintiffs here consist of two minor children and their mother. In *Dawson*, there was also a concern that evidence would be destroyed, but the United States does not allege this argument as a basis for detaining Plaintiffs. In fact, the United States simply recites a one sentence holding from the case, out of context and with no analysis to the facts at hand.

The burden is on the United States to show no genuine dispute of material fact as to the false imprisonment claim. It has not done so here. Viewing the evidence in the light most favorable to Plaintiffs, a jury could find that the one-to-three-hour period of detention and the manner in which it was conducted—detaining and pushing young, crying children and their mother—was unreasonable. Other factors the jury could consider include the non-violent nature of Tuchinsky's underling crimes, that Plaintiffs did not appear to be involved in the crime, the particularly young ages of the minor children, the fact that the children were separated from their mother, and Borovik's interrogation on unrelated matters. Alternatively, the jury could weigh the evidence and find the agents' testimony credible. Regardless, several facts material to resolving the false imprisonment claim here are genuinely disputed or unclear. Accordingly, the Court **DENIES** the United States' Motion for Summary Judgment as to Plaintiffs' false imprisonment claim.

c.    Intentional Infliction of Emotional Distress

To plead intentional infliction of emotional distress ("IIED") in California, a plaintiff

-20-

3:22-cv-00171-BEN-KSC

must plausibly allege: "(1) extreme and outrageous conduct by the defendant; (2) the defendant's intention of causing, or reckless disregard of the probability of causing, emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Robles v. Agreserves, Inc.*, 158 F. Supp. 3d 952, 977 (E.D. Cal. 2016) (citing *Hughes v. Pair*, 46 Cal. 4th 1035, 1050–51 (Cal. 2009)).

The United States argues that "the evidence in this case reveals that the FBI agents involved in Tuchinsky's arrest were professional and accommodating under the circumstances." ECF No. 38 at 12. In addition, because the agents were acting under valid warrants and employed no unreasonable force, the United States contends they did not engage in extreme and outrageous conduct as a matter of law. *Id.* The United States argues that "it is well-settled that law enforcement officers are entitled to do exactly what the FBI agents did here – take reasonable precautions to ensure their safety and the safety of others durn the execution of valid warrants." *Id.* Plaintiffs only argue that based on the agents' conduct, they have "suffered severe emotional distress . . . ." ECF No. 39 at 9. The United States also argues that Plaintiffs waived their claim of IIED by failing to provide anything other than a few conclusory statements regarding the agents' conduct. *See* Reply at 7. The Court disagrees.

The burden of proof is on the moving party, and in seeking summary judgment for Plaintiffs' IIED claim, the United States simply relies on its contention that it used reasonable force in executing valid warrants. Although the validity of the warrants is not in dispute, whether the agents employed reasonable force remains heavily contested. The United States cites a string of cases but again fails to apply the law of those cases to the facts at hand. The United States does not address the deposition testimony of MT and AT and takes certain testimony from Borovik out of context.

A jury could find that aggressively pushing, grabbing, kicking, and pointing guns at small children and their mother could constitute extreme and outrageous behavior under the circumstances—inflicting distress on AT, MT, and Borovik. A jury could also agree

3:22-cv-00171-BEN-KSC

with the agents' version of events, finding no ill intent and that they were gentle and justified in both moving and detaining Plaintiffs.  But again, the Court cannot weight the evidence at the summary judgment stage.  After review of the record, the Court finds the United States did not meet its burden in proving there is no genuine dispute of material fact regarding Plaintiffs' IIED claim.  Plaintiffs' argument in opposition may be minimal with respect to IIED, but as the non-moving parties, all reasonable inference must be drawn in their favor.  *See City of Pomona*, 750 F.3d at 1049.  The factual record gives rise to numerous disputes of material fact.  Accordingly, the Court **DENIES** the United States' Motion for Summary Judgment as to Plaintiffs' IIED claim.

## IV.   JOINT MOTION TO PRECLUDE TESTIMONY

Finally, the parties jointly argue that Tuchinsky was subpoenaed for deposition as a witness who is likely to have discoverable information in this case.  ECF No. 30 at 2.  However, Tuchinsky intends to invoke his Fifth Amendment privilege and thereby refuses to answer any questions under oath.  *Id.*  To avoid the need to proceed further with Tuchinsky's deposition, the parties have agreed to exclude Tuchinsky's testimony at trial.  *Id.*  To the extent Tuchinsky's Fifth Amendment privileges are waived by way of plea or voluntarily, the parties assert that Plaintiffs will not be precluded from filing a motion to reopen discovery solely to permit the deposition of Tuchinsky prior to trial.  *Id.*  Finding good cause, the Court **GRANTS** the parties' Joint Motion and precludes the testimony of Tuchinsky.

## V.   CONCLUSION

In short, this case is riddled with questions of fact: what did the officers do, or fail to do, and why?  This is a classic case for a trial on the merits.  Defendants' Motion for Summary Judgment is denied.  The motion to strike is granted without prejudice.  Specifically,

1.     The Court **DENIES** the United States' Motion for Summary Judgment with respect to Plaintiffs' assault and battery claims.

2.     The Court **DENIES** the United States' Motion for Summary Judgment with

respect to Plaintiffs' false imprisonment claim.

3.      The Court **DENIES** the United States Motion for Summary Judgment with respect to Plaintiffs' IIED claim.

4.      The Court **GRANTS** the parties' Joint Motion to Preclude the Testimony of Yevgeny Tuchinsky.

**IT IS SO ORDERED.**

DATED:    July 22, 2024

_____
**HON. ROGER T. BENITEZ**
United States District Judge

-23-

3:22-cv-00171-BEN-KSC