UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.T., a minor by and through his Guardian Ad Litem VIKTORIIA ZUBKOVA; A.T., a minor by and through her Guardian Ad Litem VIKTORIIA ZUBKOVA; and LEYLA BOROVIK,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No.:  22-CV-171 TWR (KSC)<br><br>**STATEMENT OF FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL** |

Plaintiffs Leyla Borovik, M.T. (by and through his Guardian Ad Litem Viktoriia Zubkova), and A.T. (by and through her Guardian Ad Litem Viktoriia Zubkova) initiated this action against Defendants United States of America, Federal Bureau of Investigation ("FBI") Special Agent Trent Pedersen, and Does 1–30. (*See* ECF No. 1 ("Compl.").) The operative Complaint alleged the following four causes of action on behalf of all Plaintiffs: (1) Federal Tort Claims Act ("FTCA") claims against all Defendants for assault and battery, (2) FTCA claims against all Defendants for false imprisonment, (3) FTCA claims against all Defendants for intentional infliction of emotional distress, and (4) *Bivens* claims against all Defendants for violation of Plaintiffs' Fourth Amendment rights. (*See* ECF No.

4.) The Honorable Roger T. Benitez dismissed Plaintiffs' *Bivens* claims, as well as all claims against Special Agent Pedersen and the Doe Defendants. (*See* ECF No. 14 at 26.)

After Judge Benitez denied Defendant United States of America's Motion for Summary Judgment, (*see* ECF No. 45), the undersigned presided over a two-day bench trial that began on February 24, 2025, (*see* ECF Nos. 59, 61). During the trial, the Court heard testimony from Plaintiff M.T., Yevgeny Tuchinsky, FBI Special Agent Rebekah Frank, Dr. Cynthia Norall, FBI Special Agent Steven Hoogland, Plaintiff Leyla Borovik, Plaintiff A.T., FBI Special Agent Nicole Martin, FBI Interpreter "Lana," Edgar Fritz, FBI Special Agent Laura Wetterer, FBI Special Agent Steven Hymas, and Retired FBI Special Agent James Malpede. (*See* ECF No. 62.) Subsequently, the Parties filed their closing briefs. (*See* ECF No. 71 ("Def.'s Br."); ECF No. 72 ("Pl.'s Br.").)

Having carefully considered the record, the Parties' arguments, and the relevant law, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1). *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.")

## FINDINGS OF FACT[1]

### I. The Warrants

1. On October 24, 2019, Yevgeny Tuchinsky was indicted in the District of Utah, and a warrant issued that day authorized the arrest of Mr. Tuchinsky for crimes related to wire fraud and money laundering. (ECF No. 58 at 11–12 ("Stip. Facts") ¶¶ 1–2; *see also* Ex. 501.)[2] The same day, the Honorable Karen S. Crawford of the Southern District of

---

[1] To the extent that the record contains testimony contrary to the factual findings set forth below, the Court has determined that any such contradictory testimony is not credible. *See* 9th Cir. Crim. Jury Instr. 6.9 (2024).

[2] All citations to numbered exhibits refer to exhibits that the Court received into evidence at trial. The Court received Defense exhibits 501–03 and 506–10. (*See* ECF No. 63.) Because Plaintiffs failed to

California issued a warrant that authorized the search of Mr. Tuchinsky's San Diego residence and the seizure of certain items. (Stip. Facts ¶ 2; *see also* Ex. 502.)

2. The Operations Order, which the FBI agents "were following on [the day that they executed the warrants]," (ECF Nos. 64–66 ("Trial Tr.") at 198:11–16),[3] cautioned that "weapons w[ould] likely be found at the residence." (Ex. 503 at 1.)[4] Specifically, the search and seizure warrant identified a "DPMS LRT-SASS .308 cal[iber] rifle" to be seized at Mr. Tuchinsky's San Diego residence. (Ex. 502 at 4.)

3. The Operations Order also notified the agents of the "[p]otential presence of two children around ages 6 and 8." (Ex. 502 at 3.) Indeed, on the day the agents executed the warrants, M.T. and A.T. were six years old and eight years old, respectively. (Trial Tr. at 16:7–8, 214:10–11.)

## II. Execution of the Warrants

### A. *Initial Contact and Clearing the Residence*

4. Around 6:00 a.m. on October 25, 2019, FBI agents executed the search and arrest warrants at Mr. Tuchinsky's San Diego residence. (Stip. Facts ¶ 3; Ex. 503 at 1.)

5. As directed by the Operations Order, nine agents formed a single-file "stack" outside the front door to the residence. (Trial Tr. at 173:12–25, 176:6–17; *see also* Ex. 503 at 5.) FBI Special Agent Steven Hoogland was at the front of the stack, and he was armed with a "Remington 870, a 12-gauge shotgun." (Trial Tr. at 174:1–5; *see also* Ex. 503 at 11.) A flashlight "was mounted on the front of the shotgun." (Trial Tr. at 180:2–3.) The other agents in the stack were armed with agency-approved nine-millimeter Glock 19M

---

move any exhibits into evidence at trial, Plaintiffs' exhibits are not part of the record before the Court. (*See* ECF No. 72.)

[3] All page-specific citations to the trial transcript refer to the page numbers that are located in the top-right of each page and run sequentially throughout the entire transcript document, from ECF No. 64 to ECF No. 66.

[4] All page-specific citations to Defendant's exhibits refer to the six digit numeral in the bottom-center of each page, which identifies the exhibit number and the page number.

handguns.  (Trial Tr. at 86:4–14, 175:23–176:3; *see also* Ex. 503 at 11.)  Special Agent Hoogland was the only agent armed with a long gun or shotgun.  (Trial Tr. at 197:13–17; *see also* Ex. 503 at 11.)

6.     Consistent with their training, the armed FBI agents held their weapons at the "gun at the ready" or "gun ready" position, meaning that they pointed their weapons "at a forty-five degree angle" towards the ground, "in a safe direction," "not directly [] at any person."  (Trial Tr. at 86:15–87:3, 176:18–177:5.)

7.     Special Agent Hoogland knocked on the front door of the residence and called, "FBI, search warrant, open the door."  (Trial Tr. at 177:21–23.)  He was wearing a blue polo shirt, khaki pants, and a green ballistic vest emblazoned with "FBI" in yellow letters on the front and back.  (Trial Tr. at 200:6–10.)  Other agents also wore apparel that identified their status as FBI agents.  (Trial Tr. at 108:22–24.)

8.     Mr. Tuchinsky answered the door.  (Trial Tr. at 43:6–12, 177:23–25.)  The agents told Mr. Tuchinsky that he was under arrest, and they handcuffed him.  (Trial Tr. at 43:13–21, 179:6–10.)  Special Agent Hoogland never pointed the shotgun at Mr. Tuchinsky.  (Trial Tr. at 200:17–19.)

9.     Shortly after the agents handcuffed Mr. Tuchinsky, M.T.—whose bedroom was immediately adjacent to the main entrance of the home, (Trial Tr. at 17:19–23)—ran past his father and out of the residence.  (Trial Tr. at 93:15–24.)  Special Agent Rebekah Frank, who was "towards the front" of the stack but "not [one of] the first three individuals[,]" (Trial Tr. at 85:11–13), noticed that there was "a little boy in the yard."  (Trial Tr. at 93:15–19.)  She holstered her weapon and grabbed the child, "[f]or his safety[, ] for agent safety, [and] to maintain control of the situation."  (Trial Tr. at 93:17–20, 97:18–20.)  Additionally, to protect M.T. from witnessing his father's arrest, Special Agent Frank "turned the little boy so he was facing away."  (Trial Tr. at 109:17–23.)

10.    After placing Mr. Tuchinsky in custody, some FBI agents, including Special Agent Hoogland, entered the residence with their weapons in "gun ready" position.  (Trial Tr. at 179:11–24, 181:15–20.)  Special Agent Hoogland, with Special Agent Kari Harrison

right behind him, proceeded down a dark hallway until he encountered a room with a closed door. (Trial Tr. at 182:2–18, 183:4–18.)

11. Special Agent Hoogland opened the door with his left hand and held the shotgun, pointed at the ground, with his right hand. (Trial Tr. at 184:10–13.) After he opened the door, Special Agent Hoogland brought the shotgun back to "gun ready" position and scanned the room. (Trial Tr. at 184:23–25, 185:17–19.) The flashlight affixed to the weapon, despite being pointed at a forty-five degree downward angle, sufficiently illuminated the room so that Special Agent Hoogland "was able to see movement in the room." (Trial Tr. at 186:7–12.)

12. Without pointing his shotgun at the occupant of the room, Special Agent Hoogland observed a "little girl in bed," later identified as A.T. (Trial Tr. at 187:16–24.) Special Agent Harrison "came around [Special Agent Hoogland's] right side," approached A.T., and asked A.T. to "come with [her]." (Trial Tr. at 187:25–188:3.) Special Agent Harrison then "took [A.T.] by the hand and removed her from the room." (Trial Tr. at 188:3–4.)

13. Leyla Borovik, wife of Mr. Tuchinsky and mother to M.T. and A.T., occupied a bedroom towards the rear of the residence, separate from that of her husband. (Trial Tr. at 212:16–25.) At some point during the initial entry, Ms. Borovik awoke to a "very loud noise." (Trial Tr. at 213:1–8.) She approached her bedroom door and encountered an FBI agent, who instructed her to exit the room and to follow him. (Trial Tr. at 219:5–19.) The agent led Ms. Borovik to the front-entrance area of the home, where she saw her husband and M.T. (Trial Tr. at 220:12–23, 222:6–8.) Ms. Borovik observed A.T. exit her bedroom and "mov[e] towards" the family members in the front-entrance area, and Ms. Borovik grabbed her. (Trial Tr. at 224:10–20.)

14. After Special Agent Harrison escorted A.T. from her bedroom, and with the family secured in the front of the house, Special Agent Hoogland and other FBI agents continued to clear the rest of the house for the following four to six minutes. (Trial Tr. at / / /

188:15–20.) In total, agents moved around the house with unholstered weapons for about ten minutes. (Trial Tr. at 56:11–13, 201:3–15, 243:5–11.)

15. Special Agent Hoogland never pointed the shotgun directly at M.T. or A.T. (Trial Tr. at 200:20–201:2.) FBI agents never handcuffed Ms. Borovik or the two children. (Trial Tr. at 245:11–15.) FBI agents never told Ms. Borovik or the two children to lay on the ground. (Trial Tr. at 245:16–22.) FBI agents never removed M.T. or A.T. from Ms. Borovik's arms. (Trial Tr. at 246:14–16.)

### B. Interviews of Mr. Tuchinsky and Ms. Borovik

16. Once the FBI agents cleared the residence, two agents took Mr. Tuchinsky into his bedroom for an interview. (Trial Tr. at 225:2–8, 242:19–21, 328:7–21, 345:14–21.) Around the same time, other agents moved Ms. Borovik, M.T., and A.T. into M.T.'s bedroom, which was directly across from Mr. Tuchinsky's bedroom. (Trial Tr. at 225:13–21.)

#### 1. Interview of Mr. Tuchinsky

17. Special Agent Steven Hymas and Special Agent James Malpede accompanied Mr. Tuchinsky into his bedroom and closed the bedroom door. (Trial Tr. at 328:11–24, 345:14–21.) Before beginning the interview, the two agents asked Mr. Tuchinsky "if he wanted to put some clothes on." (Trial Tr. at 345:22–24.) Mr. Tuchinsky declined, stating that "he was fine the way he was." (Trial Tr. at 345:25–346:3.)

18. At or around 6:10 a.m., FBI agents advised Mr. Tuchinsky of his rights and provided to him an FBI "Advice of Rights" form. (Stip. Facts ¶ 4; Ex. 506; Trial Tr. at 329:9–18.) Mr. Tuchinsky signed the "Advice of Rights" form and consented to an interview with the agents. (Stip. Facts ¶ 4; Ex. 506; Trial Tr. at 329:13–330:16.)

19. Before asking Mr. Tuchinsky any substantive questions, Special Agent Hymas and Special Agent Malpede told Mr. Tuchinsky that his family "would be taken care of" and that any "needs that they had, whether it be food or bathroom or if they needed to go to school . . . would be taken care of." (Trial Tr. at 347:17–24; *see also* Ex. 508 at 00:01:05.)

20. During the interview, Mr. Tuchinsky informed the agents that the rifle identified in the search and seizure warrant was located at his residence in Utah. (Stip. Facts ¶ 5.) Later that day, FBI agents in Utah obtained access to Mr. Tuchinsky's Utah residence, where they located and seized the weapon. (Stip. Facts ¶ 6; *see also* Ex. 507.)

21. Special Agent Hymas and Special Agent Malpede concluded their interview of Mr. Tuchinsky at approximately 8:48 a.m., and at approximately 8:53 a.m., agents transported Mr. Tuchinsky to the FBI office in San Diego for booking. (Stip. Facts ¶ 7.)

*2.   Interview of Ms. Borovik*

22. While Special Agent Hymas and Special Agent Malpede interviewed Mr. Tuchinsky, "Lana," an FBI Russian Language Specialist, joined Ms. Borovik, M.T., and A.T. in M.T.'s bedroom. (Trial Tr. at 284:6–10, 284:19:23, 285:7–14.) A female agent was also in the room. (Trial Tr. at 285:11.) The female agent had her weapon holstered, and Lana was unarmed. (Trial Tr. at 284:15–18, 285:7–14.)

23. The female agent left the room. (Trial Tr. at 285:18–21.) Approximately two to five minutes later, Special Agent John Cunning entered the room and asked Ms. Borovik if she was willing to talk to the agents. (Trial Tr. at 227:4–7, 285:22–25.) At some point, Special Agent Frank joined the conversation. (Trial Tr. at 103:7–16.)

24. Ms. Borovik said that she was willing to speak with the FBI agents. (Trial Tr. at 286:1–2.) She expressed concern about leaving her children, but the agents told her that someone would watch the children while the agents interviewed her. (Trial Tr. at 286:2–4.) The agents asked Ms. Borovik which room was the best room in which to interview her, and she indicated that the loft on the second floor was best. (Trial Tr. at 104:12–15, 286:4–7.)

25. Special Agent Frank, Lana, and another FBI agent interviewed Ms. Borovik in the loft. (Trial Tr. at 104:12–15, 287:12–14.) Ms. Borovik and the agents discussed Ms. Borovik's relationship with her husband and her knowledge of her husband's business. (Trial Tr. at 106:7–14, 288:1–15.)

///

26. Ms. Borovik's interview lasted approximately forty minutes to one hour, and Ms. Borovik never expressed a desire to end the conversation out of concern for her children. (Trial Tr. at 107:19–20, 110:24–111:4, 288:16–25.)

27. After her interview, Ms. Borovik asked to change her clothes, and the agents permitted her to do so. (Trial Tr. at 289:14–17.) Lana accompanied Ms. Borovik to her bedroom and waited in the room while Ms. Borovik changed in the bathroom. (Trial Tr. at 289:17–24.) Ms. Borovik had her cell phone with her, and she used the cell phone to make and receive calls. (Trial Tr. at 289:25–290:12.)

28. Ms. Borovik, in the company of Lana and Special Agent Frank, went to the kitchen area. (Trial Tr. at 111:17–24, 289:19–20.) Ms. Borovik "asked if she could cook breakfast for the children." (Trial Tr. at 291:2–4.) The agents gave Ms. Borovik permission to do so, and Ms. Borovik prepared a meal for M.T. and A.T. (Trial Tr. at 291:3–20.)

### 3. *Treatment of M.T. and A.T.*

29. While other FBI agents interviewed Mr. Tuchinsky and Ms. Borovik, Special Agent Nicole Martin and Special Agent Laura Wetterer, both of whom were assigned to the search team, stayed with M.T. and A.T. and supervised them. (Trial Tr. at 302:9–13, 318:2–12.)

30. Special Agent Wetterer took M.T. and A.T. to their playroom, which was down a hallway and near the kitchen. (Trial Tr. at 318:13–17.) Special Agent Martin joined Special Agent Wetterer and the children in the playroom. (Trial Tr. at 307:4–7, 318:18–22.)

31. The agents entertained the children by playing games in the playroom with them. (Trial Tr. at 303:1–2, 318:23–319:3.) M.T. and A.T. interacted with the agents and spoke with them about their school, their friends, and their toys. (Trial Tr. at 303:4–22, 319:4–7.) The agents observed that the children "were very talkative and happy and seemed to be having a good time." (Trial Tr. at 304:19–24.) The children were never separated from each other. (Trial Tr. at 276:7–9, 219:20–22.)

32.     Once the other agents completed their interview of Ms. Borovik, Special Agent Wetterer accompanied M.T. and A.T. to the kitchen, where the children ate the breakfast that Ms. Borovik had prepared. (Trial Tr. at 319:23–320:4, 325:15–17.)

### 4.  *Completion of the Search*

33.     After the FBI agents completed their search of the residence, the agents seized several items pursuant to the seizure warrant. (Stip. Facts ¶ 8.)

34.     The FBI agents concluded their search at approximately 9:35 a.m., and the search team left an FBI "Receipt for Property Seized" and a copy of the search and seizure warrant with Ms. Borovik. (Stip. Facts ¶ 9.)

## CONCLUSIONS OF LAW

1.     Under the FTCA, a private party may seek money damages from the United States "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

2.     "In assessing the United States' liability under the FTCA," the Court is "required to apply the law of the state in which the alleged tort occurred." *Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006) (citing *Trenouth v. United States*, 764 F.2d 1305, 1307 (9th Cir. 1985)). Accordingly, California law governs Plaintiffs' FTCA claims.

### I. Assault and Battery Claims

3.     To prevail on a claim for assault under California law, a plaintiff must establish by a preponderance of the evidence that

> (1) the defendant threatened to touch the plaintiff in a harmful or offensive manner; (2) it reasonably appeared to the plaintiff that the defendant was about to carry out the threat; (3) the plaintiff did not consent to the defendant's conduct; (4) the plaintiff was harmed; and (5) the defendant's conduct was a substantial factor in causing the plaintiff's harm.

*Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012); *see also* Judicial Council of Cal., Civil Jury Instructions No. 1301 (2025).

/ / /

4. To prevail on a claim for battery under California law, a plaintiff must establish by a preponderance of the evidence that

> (1) the defendant physically touched the plaintiff with the intent to harm or offend the plaintiff; (2) the plaintiff did not consent to the touching; (3) the plaintiff was harmed or offended by the defendant's conduct; and (4) a reasonable person in plaintiff's situation would have been offended by the touching.

*Avina*, 681 F.3d at 1130–31; *see also* Judicial Council of Cal., Civil Jury Instructions No. 1300 (2025).

5. Additionally, for an assault or battery claim related to the conduct of a law enforcement officer, California law requires the plaintiff to establish that the law enforcement officer used unreasonable force. *Avina*, 681 F.3d at 1130; *see also Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273–73 (1998).

6. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Saman v. Robbins*, 173 F.3d 1150, 1156 (9th Cir. 1999) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "The relevant factors used in the reasonableness inquiry include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (citing *Graham*, 490 U.S. at 386).

7. Accordingly, to succeed on their assault and battery claims, Plaintiffs must prove (1) the elements of assault and battery *and* (2) that the FBI agents used unreasonable force.

8. The Court finds that Plaintiffs' assault and battery claims fail because the FBI agents did not use unreasonable force against M.T., A.T., or Ms. Borovik when the agents executed the search and arrest warrants at Mr. Tuchinsky's San Diego residence on October 25, 2019.

9. First, the agents wielded their weapons professionally and reasonably, in a manner that accomplished the agents' law enforcement objectives without compromising

the safety of the individuals with which the agents interacted. *See Los Angeles Cnty. v. Rettele*, 550 U.S. 609 (2007) (holding that it was reasonable for officers executing search and arrest warrants related to fraud and identity-theft crimes to order naked residents out of bed and hold them at gunpoint because the officers reasonably believed one suspect owned and possessed a handgun).

10. Here, as in *Rettele*, the law enforcement officers executing the search warrant reasonably believed that an induvial at the residence owned and possessed a firearm. *See id.*; (Ex. 503 at 1; Ex. 502 at 4.) In contrast to the officers in *Rettele*, however, the agents in this case kept their weapons in the "gun ready" position and never held any family member at gunpoint. *See* 550 U.S. at 611; (Trial Tr. at 86:15–87:3, 176:18–177:5, 187:16–24, 200:20–201:2.)

11. Second, the agents used only the limited physical contact that was necessary to safely and effectively execute the search and arrest warrants. Although Special Agent Frank physically controlled M.T. when he ran out of the house during the agents' initial entry into the residence, (Trial Tr. at 93:17–20, 109:17–18), her actions were reasonable considering the risks inherent to executing an arrest warrant, the agents' knowledge that Mr. Tuchinsky owned and possessed a firearm, and the need to protect the young child. Additionally, any physical contact initiated by the agents while escorting Plaintiffs between rooms, such as Special Agent Harrison taking A.T.'s hand in A.T.'s bedroom, (Trial Tr. at 188:3–4), was reasonably necessary to control the situation and to protect the safety of all individuals present at the residence.

12. Third, the FBI agents' actions in this case differ significantly from the actions of the law enforcement officers in cases in which the Ninth Circuit has held that there is a triable issue of fact as to the reasonableness of the law enforcement officers' actions. *See Avina*, 681 F.3d at 1132–33 (DEA agents pointed their guns at the head of an eleven-year-old girl while she lay on the ground in handcuffs); *Tekle v. United States*, 511 F.3d 839, 843, 854–55 (9th Cir. 2007) (law enforcement officer held gun to eleven-year-old boy's head while the boy lay face down on the ground and was handcuffed).

13. The Court therefore concludes that Plaintiffs have failed to prove by a preponderance of the evidence their FTCA claims for assault and battery.

## II. False Imprisonment Claims

14. A claim for false imprisonment under California law requires a plaintiff to prove by a preponderance of the evidence "(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, (3) for an appreciable period of time, however brief." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1169 (9th Cir. 2011); *see also* Judicial Council of Cal., Civil Jury Instructions No. 1400 (2025).

15. As to the second element, a law enforcement officer's "authority to detain incident to a search is *categorical* . . . [and] the duration of a detention may be coextensive with the period of a search and require no further justification." *Dawson v. City of Seattle*, 435 F.3d 1054, 1066 (9th Cir. 2006) (emphasis in original) (quoting *Muehler v. Mena*, 544 U.S. 93, 125 (2005)). Thus, an officer has the "authority to detain a building's occupants during a search so long as the officer conducts the detention in a reasonable manner." *Id.*; *see also Ganwich v. Knapp*, 319 F.3d 1115, 1121–23 (9th Cir. 2003) (holding that it was reasonable to detain business' employees for up to four hours and forty-five minutes during search of the business but that it was unreasonable to detain the plaintiffs incommunicado and to condition their release on their willingness to submit to an interrogation).

16. The Court finds that Plaintiffs' false imprisonment claims fail because the FBI agents had lawful privilege to search the residence and the agents detained Ms. Borovik, M.T., and A.T. in a reasonable manner for the duration of the search.

17. The FBI agents acted with lawful privilege because the agents were executing valid search and arrest warrants when they entered and searched Mr. Tuchinsky's San Diego residence on October 25, 2019. (*See* Exs. 501, 502; Trial Tr. at 196:13–19, 197:1–4.)

18. Because the FBI agents searched the residence with lawful privilege, the agents had the authority to detain Ms. Borovik, M.T., and A.T. in a reasonable manner for the duration of the search. *See Dawson*, 435 F.3d at 1066.

///

19. The FBI agents detained Ms. Borovik, M.T., and A.T. in a reasonable manner. Although the search and the corresponding detention lasted approximately three-and-a-half hours, (*see* Stip. Facts ¶¶ 3, 9), the agents entertained the children in the playroom, (*see* Trial Tr. at Trial Tr. at 303:1–22, 318:13–319:7), and permitted Ms. Borovik to move about the house, (*see* Trial Tr. at 111:17–24, 289:16–24) make telephone calls, (*see* Trial Tr. at 289:25–290:11), change her clothes, (*see* Trial Tr. at 289:16–18), and prepare breakfast for the children, (*see* Trial Tr. at 291:2–20). Furthermore, the agents in no way unduly pressured Mr. Tuchinsky or Ms. Borovik to submit to FBI interviews; both voluntarily agreed to be interviewed. (*See* Trial Tr. at 47:17–25, 71:19–72:1, 110:8–18, 285:15–286:7, 286:24–287:6, 346:10–11); *cf. Ganwich*, 319 F.3d at 1121–23.

20. Moreover, the agents' detention of Ms. Borovik, M.T., and A.T. was reasonable because important law enforcement interests outweighed Plaintiffs' privacy interests. *See Dawson*, 435 F.3d at 1066 ("To determine whether a detention incident to a search is constitutionally reasonable, we balance the law enforcement interests served by the detention against the public's privacy interests."). Moving Ms. Borovik, M.T., and A.T. into M.T.'s bedroom during the agents' initial entry into the residence helped the agents control the situation and "minimized the risk of harm to officers" or the family. *See Ganwich*, 319 F.3d at 1120. Accompanying Ms. Borovik, M.T., and A.T. throughout the house allowed the agents to maintain control over the search and "ensured that [Plaintiffs] were on the premises to assist officers in case they needed (for example) a door or cabinet unlocked." *See id.* Although the agents' actions certainly invaded Plaintiffs' privacy, the law enforcement interests attendant to executing the search and arrest warrants outweighed Plaintiffs' privacy rights. *See Dawson*, 435 F.3d at 1066 ("[I]t was reasonable [for city police officers] to assemble tenants in a suitable place at the earliest practical opportunity in order to facilitate the [health] inspection and its completion."); *Ganwich*, 319 F.3d at 1120.

21. The Court therefore concludes that Plaintiffs have failed to prove by a preponderance of the evidence their FTCA claims for false imprisonment.

### III. Intentional Infliction of Emotional Distress Claims

22. To prevail on a claim for intentional infliction of emotional distress under California law, a plaintiff must establish by a preponderance of the evidence

> (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by [the] defendant's outrageous conduct.

*Sabow v. United States*, 93 F.3d 1445, 1454 (9th Cir. 1996); *see also* Judicial Council of Cal., Civil Jury Instructions No. 1600 (2025).

23. "Conduct is deemed outrageous if it is so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Simo v. Union of Needletrades, Indus. & Textile Emps., Sw. Dist. Council*, 322 F.3d 602, 622 (9th Cir. 2003) (internal quotation marks omitted) (quoting *Saridakis v. United Airlines*, 166 F.3d 1272, 1278 (9th Cir. 1999)).

24. The Court finds that Plaintiffs' intentional infliction of emotional distress claims fail because the agents' conduct was neither extreme nor outrageous—it was reasonable. As the Court has already found, the agents used only reasonable force to enter the home, arrest Mr. Tuchinsky, and remove Plaintiffs from their rooms. (*See supra* at 10:13–11:17) The Court has also found that the agents controlled Plaintiffs' movement and invaded Plaintiffs' privacy in only a limited and reasonable manner. (*See supra* at 12:13–13:18.) The agents' objectively reasonable conduct therefore falls far short of the "extreme and outrageous" threshold.

25. Furthermore, Plaintiffs' intentional infliction of emotional distress claims also fail because Plaintiffs have not established that the FBI agents intended to cause emotional distress or acted with reckless disregard for the probability of causing emotional distress. All testifying FBI personnel who participated in the search on October 25, 2019, credibly stated that their intent was to effectively execute the warrants with due regard for the family's safety. (*See* Trial Tr. at 114:6–8, 202:19–23, 292:16–21, 305:21–306:4, 315:18–21, 321:2–12.)

26. The Court therefore concludes that Plaintiffs have failed to prove by a preponderance of the evidence their FTCA claims for intentional infliction of emotional distress.

## CONCLUSION AND RULINGS

27. It is clear that the predawn events of October 25, 2019, profoundly affected Ms. Borovik and her young children. However, the FBI agents who executed the search and arrest warrants did so in an entirely appropriate and professional manner, and the Court therefore concludes that the FBI agents are not legally responsible for any harm suffered by M.T., A.T., and Ms. Borovik. Indeed, the responsibility for the traumatic nature of the events of October 25, 2019, lies solely with Yevgeny Tuchinsky, whose ill-advised decision to engage in felonious conduct necessitated the enforcement actions taken by the FBI agents on that day.

28. Having carefully considered the record, the relevant law, and the Parties' arguments, the Court **FINDS** that Plaintiffs have failed to prove by a preponderance of the evidence that the United States is liable under the FTCA for assault and battery, false imprisonment, or intentional infliction of emotional distress. Therefore, the Court **FINDS IN FAVOR OF** Defendant United States of America. The Clerk of Court **SHALL CLOSE** the file.

**IT IS SO ORDERED.**

Dated: April 10, 2025

_____
Honorable Todd W. Robinson
United States District Judge